James William POPE, Sr. and Mary Ann
Pope, d/b/a Century 21, Pope's Realty,
Plaintiffs,

v.

MISSISSIPPI REAL ESTATE
COMMISSION, et al.,
Defendants.

Civ. A. No. EC 84–265–D–D.

United States District Court,
N.D. Mississippi, E.D.

April 5, 1988.

256

Jim Waide, Tupelo, Miss., for plaintiffs.

John W. Crowell, Columbus, Miss., for Phil Roberts.

Reed Hillen, Tupelo, Miss., for Monroe County Bd. of Realtors, Jack Francis and Mary Lib Francis.

John L. Maxey, II, Jackson, Miss., for Miss. Real Estate Com'n.

Elizabeth Ann Odom, Aberdeen, Miss., for Joyce B. Murphy.

Robert D. Butters, Chicago, Ill., for Nat. Ass'n of Realtors.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

James William Pope, Sr. and Mary Ann Pope ("Popes", "plaintiffs" or "non-movants") have brought this action against both private and government defendants[1]

1. The government defendants include the Mississippi Real Estate Commission and persons acting on behalf of the Mississippi Real Estate Commission. The other government parties include John L. Kennedy, Sharon F. Abide, J.B. McGehee, Daniel L. Bland, and Harry J. Joa-

claiming violations of both federal and state law. The plaintiffs' claims against the private defendants include federal antitrust violations and the following state law claims: state antitrust violations; interference with economic relations, business relations, and business contacts in violation of state laws; and libel, slander, and defamation. Plaintiffs' claims against the government defendants include federal antitrust claims and violations of the First Amendment, due process clause, and equal protection clause, as well as state law claims which include state antitrust violations; interference with economic relations, business relations, and business contacts violations; libel, slander and defamation; violation of the public record statute; and violation of separation of powers requirement of the Mississippi Constitution. The government and private defendants have separately moved for summary judgment. The government and private defendants have shown the absence of material issues of fact and argue that they are entitled to judgment as a matter of law. The plaintiffs responded by amending their complaint and providing a brief, an affidavit, and several depositions in opposition to both motions for summary judgment.

The court has reviewed the extensive evidentiary record, the plaintiffs' pleadings and brief, the defendants' pleadings and numerous briefs in support of their motions for summary judgment, and has carefully considered the record as a whole. The court has gone to great lengths to consider each claim of the plaintiffs and the evidence presented by the plaintiffs in support of their claims. The court is now convinced that the record in the case *sub*

*judice* justifies the granting of the motions for summary judgment, even though the court recognizes that a full blown trial will often serve a useful purpose in such a complex action. The plaintiffs fail to set forth sufficient evidence to establish a genuine issue of material fact and the court accordingly finds that the defendants are entitled to judgment as a matter of law.

## Factual Background

### A. Plaintiffs' Allegations

The Popes are engaged in the real estate business in Amory, Mississippi which is located in Monroe County. The plaintiffs allege that they began work in the real estate business in 1978 after they obtained broker's licenses from the Mississippi Real Estate Commission ("MREC"). The plaintiffs maintain that they have set their own sales commission rates and have refused to abide by price fixing and other anti-competitive practices which have been utilized by the defendants. To be more specific, plaintiffs allege that certain of the local private defendants [2] have denied the plaintiffs access to the multiple listing service which lists property available for sale in Monroe County, Mississippi. Plaintiffs also allege that the other private defendants [3] are jointly liable for these alleged antitrust violations because they encouraged, enticed, and joined in this activity through their constitutions and by-laws.

The plaintiffs allege that the local private defendants who are realtors have engaged in a group boycott of the plaintiffs by collectively refusing to permit the plaintiffs to show property listed by the defendants, or by placing unfair restrictions on

chim who are all members of the Mississippi Real Estate Commission. These government defendants also include Phillip D. Hardwick, Administrator of the Mississippi Real Estate Commission, and Kenneth Ammons, Chief Investigator of the Mississippi Real Estate Commission. The private defendants include the Monroe County Board of Realtors, Inc., Mississippi Association of Realtors, Inc., and the National Association of Realtors, Inc., and persons associated with these entities. These additional persons include Joyce B. Murphy, Phil Roberts, Jack Francis, and Mary Lib Francis, who are sued both individually and in their capacities as members of the Monroe County Board of Real-

tors, Inc. One other private defendant is Thad I. Vann, who is sued both individually and in his capacity as a member of the Mississippi Association of Realtors, Inc.

2. Local private defendants include the Monroe County Board of Realtors, Inc. ("MCBR" or "Board of Realtors"), Joyce B. Murphy, Phil Roberts, Jack Francis, and Mary Lib Francis.

3. National Association of Realtors ("NAR") and Mississippi Association of Realtors, Inc. ("MAR").

such showing. The plaintiffs further allege that this activity impacts interstate commerce and has an anti-competitive effect on the business of buying and selling real estate in Monroe County.

Plaintiffs allege that government and private defendants have utilized the complaint procedures of the MREC to punish the plaintiffs for competitively engaging in the real estate business. The plaintiffs allege that the defendants have unreasonably restrained trade by placing arbitrary limitations on the use of the term "realtor". Plaintiffs allege that unnamed defendants have prohibited plaintiffs from discussing employment of salesmen employed by other agencies and prohibited plaintiffs from bringing real estate courses to the Amory area. Plaintiffs allege that Jack Francis and Phil Roberts have sold insurance and listed property by unlawful "tying arrangements."

In Count II, the plaintiffs allege that the government defendants have violated the plaintiffs' First Amendment rights as follows: the defendants have purported to punish the plaintiffs for engaging in business advertising; the defendants have purported to punish the plaintiffs for advertising real estate schools and encouraging persons to attend; the defendants have punished the plaintiffs for advertising the giving of vacuum cleaners to past customers; the defendants have punished the plaintiffs for giving away tee shirts and the defendants have prohibited the plaintiffs from using the term "realtor".

In Count III, the plaintiffs allege that the government defendants have violated the due process clause as follows: defendants failed to provide plaintiffs with notice of charges and a fair and impartial hearing on charges brought before that governing body; defendant MREC is both prosecutor and judge and had ex parte communications concerning the hearing; defendants have found the plaintiffs guilty of ethical violations without a hearing; and the defendants allegedly communicated the resulting decision to the public in violation of the plaintiffs' "liberty interest".

In Count IV, the plaintiffs allege that the government defendants violated the equal protection clause by arbitrarily enforcing certain ethical regulations.

In Count V, plaintiffs allege that all of the defendants have violated state law by interfering with the plaintiffs' rights to engage in business.

In Count VI, the plaintiffs allege that private defendants Hardwick and Murphy libeled, defamed, and slandered the plaintiffs causing untrue articles to be placed in the *Aberdeen Examiner.* Similar claims were made against government defendant Vann.

In Count VII, the plaintiffs allege that the government defendants have refused to disclose various information as required by Mississippi law.

In Count VIII, the plaintiffs allege that the government defendants are in violation of the Mississippi Constitution because they combined the functions of judicial, legislative, and executive branches in one entity.

In Count IX, the plaintiffs allege that the government defendants have retaliated against the plaintiffs in violation of the First Amendment because of an earlier antitrust case brought by Century 21.

B. Defendants' Summary Judgment Motions

The private defendants moved for summary judgment on all claims brought against the private defendants. The private defendants supported their motion with a 76 page memorandum brief, a 31 page reply brief, an 11 page supplemental memorandum, attached authorities, exhibits, depositions, and affidavits. These documents attack the plaintiffs' complaint count by count in an attempt to show the court the absence of a genuine issue of material fact that would preclude a grant of summary judgment. At this point, the court will simply outline the points raised by the private defendants.

In response to Count I, the defendants concede that they have denied plaintiffs participation in the multiple listing service

("MLS") but they state that this is only because the plaintiffs have voluntarily withdrawn from participation in the Monroe County Board of Realtors ("MCBR"). The private defendants maintain that it is appropriate and legal to limit services to members of a private organization as long as there is no arbitrary or discriminatory exclusion from membership in that organization. Defendants further assert that the plaintiffs have no standing to bring this action because they voluntarily withdrew from the board. As to the complaints filed with the MREC and the response of the MREC, the private defendants maintain that the *Noerr—Pennington* doctrine exempts their activities from the antitrust laws. The private defendants also assert that the plaintiffs have shown no evidence of a conspiracy to boycott the plaintiffs' business.

The private defendants did not challenge the First Amendment, (Count II), due process (Count III), equal protection (Count IV), public record statute (Count VII), separation of powers (Count VIII), or the unlawful retaliation (Count IX) claims. The private defendants did challenge the claims which were directed at them. As to the pendent state claims which relate to the non-government defendants, they have attempted to show that there is no factual basis for Counts V or VI which involve interference with business relations, libel, defamation, and other such claims.

The government defendants have challenged all claims brought against them. The government defendants supported their motion for summary judgment with a 39 page brief, an 11 page reply brief, exhibits, depositions, affidavits, and James Pope's official file, and a transcript of a hearing at issue. The court will outline the points raised by the government defendants.

As to Count I, the government defendants point out that the plaintiffs lack standing for a claim against the MREC because of the state action exemption to the Sherman Act. Government defendants also assert that the plaintiffs have failed to demonstrate that the alleged antitrust activity related to any *inter-state* commerce. Government defendants claim that the plaintiffs have not shown that the government defendants acted outside their official capacities or acted contrary to their legislatively mandated responsibilities, and that the plaintiffs have not established the existence of any trusts, combinations, contracts, or agreements with other persons in violation of the antitrust laws.

The government defendants claim that the due process, equal protection and First Amendment claims brought against the government defendants, apparently brought pursuant to 42 U.S.C. § 1983, may not be brought against the MREC itself because of Eleventh Amendment immunity and that the other government defendants have qualified immunity or a good faith immunity defense to each of these claims. As to the substance of the due process claim, the government defendants maintain that the official procedures and the procedures actually implemented assured the plaintiffs of their due process rights. As to the substance of the equal protection claims, the government defendants claim that the plaintiffs have not shown arbitrary enforcement of regulations or any intentional or purposeful discrimination in its investigation of complaints. As to the substance of the First Amendment claims, the government defendants maintain that they were preventing misrepresentations in advertising and avoided taking actions that inhibited true freedom of speech. As to the plaintiffs' First Amendment and retaliation claim of Count IX, the government defendants assert that there was no factual showing that there was any connection between the unrelated case and the alleged actions of the MREC.

The government defendants' response to the pendent state law claims is to suggest that the court should simply dismiss these claims from federal court. The government defendants then set out sovereign immunity and public official immunity defenses. As to the libel, slander, and defamation claim, the government defendants point out that privileged communications may not establish the plaintiffs' claims. The government defendants apparently

concede the dual investigative and judicial roles of the commission, but dispute the legal argument that this is a violation of Mississippi's constitutional separate of powers requirement. As to the denial of public access to records claim, the government defendants maintain that these investigative materials were exempt, but that the defendants subsequently turned these records over to the plaintiffs, thereby eliminating this minor claim.

### C. Plaintiffs' Argumentative and Evidentiary Responses

The plaintiffs' response to the summary judgment motions was minimal at best. Plaintiffs presented one brief in opposition, along with an affidavit from James Pope and part of the depositions of Kenneth Ammons, Phillip Hardwick, Jack Francis, Mary Lib Francis, Joyce B. Murphy, and Phillip E. Roberts. The 20 page brief submitted by the plaintiffs was very general and failed to address most of the issues raised by the government and private defendants in their motions for summary judgment.

The only antitrust claims adequately addressed by the plaintiffs were the denial of access to the multiple listing service and price fixing by the private defendants. Plaintiffs claim a factual issue exists concerning some aspect of the group boycott claim. Plaintiffs boldly assert that the government defendants are not entitled to summary judgment. Plaintiffs claim that there is a factual issue as to the denial of liberty without due process of law and conclude that the government defendants are not entitled to summary judgment on either the First Amendment or due process issues. Plaintiffs also maintain that there are factual issues concerning the alleged violations of First Amendment rights.

Plaintiffs failed to point out the pertinent parts of exhibits, depositions and affidavits which created these genuine issues of material fact claimed to exist. The court nonetheless closely reviewed the affidavit and depositions relied on by the plaintiffs, as well as the remaining court record.

4. *See* pretrial order at 8–12.

### D. Defendants Reply

The government and private defendants responded to the plaintiffs' brief in a detailed manner. The private defendants claimed that the plaintiffs do not have standing to sue for price fixing and they have not shown sufficient evidence to support this claim. The private defendants also maintain that there are no material factual issues concerning the plaintiffs' non-participation in the MLS. The government defendants assume that the plaintiffs have abandoned the many claims on which they failed to respond. The government defendants responded point by point to the due process, First Amendment, and separation of powers claims asserted by the plaintiffs in their brief. The private defendants presented a supplemental memorandum which again addressed the standing issue and the basis upon which associations may charge membership fees.

### E. Uncontested Facts

The parties have set out 47 facts in the pretrial order that were established by the pleadings, stipulations, or admissions.[4] The court will bring attention to the more pertinent facts contained in the pretrial order.

The established facts that affect the antitrust claim include A–R, FF–VV. Particularly important are the following: the MCBR membership requirements (F, GG, II); requirements for MLS participation (D, E, JJ); absence of evidence of price fixing (PP, UU); evidence refuting boycott claim and market effect (L, M, N, O, LL, VV); and the use of term "Realtor" (II, QQ, RR).

The established facts that affect the First Amendment claims include possible retaliation (K, U, X, Y), non-enforcement of the Code of Ethics (EE), and the existence of a federally registered trademark (RR). The established facts that affect the due process claims (P–DD) indicate the following: the MREC acted within the scope of its official duties (P, Q, R); the MREC acted pursuant to complaints (S,Y); the

MREC gave notice (T,X); the MREC held hearings (V, AA, DD); plaintiffs failed to appeal (W, BB); and the MREC did not publish the information which allegedly defamed the plaintiffs (CC).

### Conclusions of Law

The plaintiffs have set forth a multitude of issues against both the government and private defendants based upon the factual situation outlined above. Both the government and private defendants have moved for summary judgment in this action. In this opinion, the court will address the standard to be applied to claims presented in a summary judgment posture and then will apply this standard to each of the claims brought against the defendants.

### I.

### Summary Judgment Standard

Summary judgment re-enforces the purpose of the rules to achieve a "just, speedy, and inexpensive determination" of actions. Fed.R.Civ.P. 1. Summary judgment is no longer considered a " 'peculiar procedural short cut,' but an integral part of the 'framework' of the Rules, closely related to other provisions which are similarly intended to permit the early elimination of claims and defenses that the proponents cannot support." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1197 (5th Cir.1986). Summary judgment has filled in the gaps left by the abandonment of other procedural devices and is the most efficient means of testing the sufficiency of factual allegations. *Fontenot*, 780 F.2d at 1196. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56, advisory committee note on the 1963 amendments to rule 56(e) (quoted in *Fontenot*, 780 F.2d at 1196).

A trial serves no useful purpose "[w]hen everything that can be adduced at trial is before the judge on motion and the parties, while urging conflicting ultimate facts and conclusions, have no evidentiary disputes." The proper use of Rule 56 "affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot*, 780 F.2d at 1197. However, the court must be cautious and properly balance the need for expediency with the demands of justice. The court will not casually deny a party the protections inherent in a full blown trial.

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims or defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265, 276 (1986).

### A. Movant's Initial Responsibility

■ The moving party must make a minimal showing of an absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. In *Celotex*, the Supreme Court distinguished the earlier decision of *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and held that the moving party had only the burden "to show initially the absence of a genuine issue concerning any material fact." The Supreme Court held that the *Adickes* language should not be construed to mean that the moving party has the burden to produce evidence that establishes the absence of a genuine issue of material fact. Instead, the Supreme Court held that the "burden on a moving party may be discharged by 'showing'—

that is pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275. The Supreme Court clearly held in *Celotex* that even where the movant's showing was meager and failed to fully negate the opponent's claims, summary judgment should still be granted where the evidence produced by the non-movant was insufficient as to a necessary element of the claim on which the non-movant bore the burden of proof.

### B. Non–Movant's Evidentiary Burden

[2] Once the moving party has met its initial responsibility, the non-moving party must shoulder a heavy burden in order to survive summary judgment and bring its case to trial. The summary judgment scheme provides for a shifting burden between the movant and non-movant as to the existence of genuine issues of material fact. The movant must initially "show" the absence of material issues of fact and then the non-movant has the burden to "go forward" with sufficient evidence to establish the existence of material issues of fact. *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1112 (5th Cir.1979). Rule 56(e) provides in pertinent part that:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must *set forth specific facts* showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

(emphasis added). The Supreme Court has stated that the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). The Supreme Court followed this statement with the observation that Rule 56(d) requires "specific facts" from the non-movant and then stated that if the non-movant's claim appeared implausible the non-movant must come forward with even more persuasive evidence to support the claim than would otherwise be necessary. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed. at 552. *Celotex* also held that Rule 56 requires the opposing party to go beyond the pleadings to make a sufficient showing on the essential elements of its case. *Celotex*, 477 U.S. at 321, 106 S.Ct. at 2553, 91 L.Ed.2d at 273.[5]

▪ The party with the burden of proof must respond to motions for summary judgment with sufficient evidence to support its prima facie case. "The party opposing a motion supported by affidavits cannot discharge his burden by alleging legal conclusions. There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence." *Fontenot*, 780 F.2d at 1195–1196.

▪ Although the court does not assess the probative value of the material presented, evidence in opposition to the motion that clearly is without any probative force is insufficient to raise a genuine issue. *First National Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569, 593 (1968). Denials or allegations by the non-moving party in the form of legal conclusions. which are unsupported by specific facts have no probative value and are thus insufficient to create genuine issues of material fact that would preclude summary judg-

---

5. The plaintiffs' brief seems to imply that the movant has the burden of establishing the absence of material issues of fact. This is clearly wrong. The movant must "show" the absence of evidence to support the non-movant's case, but it is only the non-movant which must actually come forward with evidence to demonstrate the existence of material issues of fact. If this

goes against the "familiar teachings" of *United States v. Realty Multi–List, Inc.*, 629 F.2d 1351, 1360 (5th Cir.1980), then the court takes comfort in the fact that this view is consistent with more recent Fifth Circuit and Supreme Court decisions. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275.

ment. *Broadway v. City of Montgomery, Alabama,* 530 F.2d 657, 660 (5th Cir.1976); *see also Benton–Volvo–Metairie, Inc. v. Volvo Southwest, Inc.,* 479 F.2d 135, 139 (5th Cir.1973). "Allegations that one 'might could' show certain facts at trial are simply insufficient under Rule 56(e)." *Pelotto v. L & N Towing Co.,* 604 F.2d 396, 403 (5th Cir.1979). The non-moving party cannot successfully defeat a summary judgment motion by unsworn statements or the suggestion that proof might be forthcoming at trial. *See Oglesby v. Terminal Transport Co., Inc.,* 543 F.2d 1111, 1112 (5th Cir.1976).

### C. The Court's Duty and the Summary Judgment Standard

Rule 56 expressly provides that the court should grant summary judgment if (1) there is no genuine issue as to any material fact and (2) the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

The court must first examine the evidentiary record to determine if a *genuine* issue of material fact exists. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202, 213 (1986). The court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." The Supreme Court has repeatedly indicated that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511, 91 L.Ed.2d at 212. Summary judgment should be granted if the evidence is "merely colorable or is not significantly probative." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed. 2d at 212.

The Supreme Court has repeatedly emphasized that the availability of summary judgment turns in part on whether a proper jury question is presented. The non-moving party need not conclusively establish its factual allegations, but it is required to provide sufficient evidence on the claimed factual dispute to require a jury or judge to resolve the party's differing versions of the truth at trial. *Anderson,* at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356, 89 L.Ed.2d at 552.

> [I]f there is 'a complete absence of probative facts' to support a particular inference, or, if 'the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at [but one] verdict,' 'the court may bypass the jury.'

*Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1124 (5th Cir.1978) (citations omitted).

The court must also determine if the factual issues in dispute are *material.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211; *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed. 2d at 273.

After determining that there are no genuine issues of material fact, the court must determine whether the moving party is entitled to judgment as a matter of law. The standard to be applied in granting summary judgment is the same standard applied in granting directed verdicts under Fed.R. Civ.P. 50(a). The court "must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511, 91 L.Ed.2d at 213.

Summary judgment motions should be granted "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c) is satisfied."

*Celotex,* 477 U.S. at 321, 106 S.Ct. at 2553, 91 L.Ed.2d at 274.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of the element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 273. The non-movant is not entitled to a full dress trial notwithstanding the absence of any significant probative evidence tending to support the allegations in their complaint. "To permit the pleadings themselves to carry a case to trial when they rest only on the invention of counsel would permit ultimate circumvention of [the Federal Rules of Civil Procedure]." *Fontenot,* 780 F.2d at 1196.

### D. Summary Judgment Applied to Anti-Trust Litigation

The Supreme Court has recently considered the standard which district courts should apply when deciding whether to grant summary judgment in antitrust cases. These decisions have signaled a marked change from the court's prior reluctance to grant summary judgment, as established in *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The Supreme Court has held that the requirements of Rule 56 are not to be read out of antitrust cases and has refused to hold that "anyone who files an antitrust complaint setting forth a valid cause of action [is thereby automatically] entitled to a full-dress trial notwithstanding the absence of any signifi-cant probative evidence tending to support the complaint." *Cities Services,* 391 U.S. at 290, 88 S.Ct. at 1593, 20 L.Ed.2d at 593. Subsequent Supreme Court cases, as well as Fifth Circuit decisions, have followed the admonishment of *Cities Services* and have granted summary judgment motions in cases where the plaintiffs have utterly failed to adduce any evidence of conspiratorial conduct.

The Supreme Court has, in a summary judgment context, addressed the issue of the conspiracy elements in antitrust litigation on two recent occasions. Conduct which is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775, 785–786 (1984). The Supreme Court stated that a plaintiff seeking damages for antitrust violations must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471, 79 L.Ed.2d at 785. "Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents." *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1357, 89 L.Ed.2d at 553.

The Fifth Circuit has clearly held that summary judgment may be appropriate in antitrust cases.

> Although summary judgment procedures 'should be used sparingly in complex antitrust litigation where motive and intent play leading rolls,' summary judment may be granted where plaintiff can aver no significant probative facts in support of its conclusory allegations of conspiracy against defendants' specific averments to the contrary.

*Paul Kadair, Inc. v. Sony Corp. of America,* 694 F.2d 1017, 1027 (5th Cir.1983). (citations omitted)

The court is most persuaded by the reasoning of *Apex Oil Co. v. DiMauro,* 641 F.Supp. 1246 (S.D.N.Y.1986). The *Apex*

court granted summary judgment against the antitrust plaintiff who claimed that he was the victim of a conspiracy among his competitors. The court recognized that *Matsushita, Monsanto,* and *Cities Service* made summary judgment available in the context of large complex antitrust conspiracy cases. "In fact, the authorities indicate that the nature of such a case demands that the district court, in considering summary judgment, give searching scrutiny to the inferences available from the typically ambiguous mass of evidence." *Apex,* at 1255. The *Apex* court reasoned as follows:

> In *Matsushita,* the Supreme Court made it clear that in an antitrust conspiracy case ambiguous evidence is to be treated skeptically on a motion for summary judgment, since an inference of unlawful conduct which arises only from ambiguous evidence will be of no use to the plaintiff at trial. In *Monsanto,* the court warned that a standard which permitted trial on the basis of such inferences presented a "considerable danger" that pro-competitive conduct would be discouraged.
>
> The test enunciated in *Matsushita* also dictates that ambiguous evidence, because it is by definition incapable of a dominant inference, will not alone defeat a motion for summary judgment.
>
> In this case, defendant's sworn denials are more than sufficient to shift the burden to plaintiff under Fed.R.Civ.P. 56(e). Thus, to survive defendants' motion for summary judgment, [the plaintiff] must establish that there is a genuine issue of material fact as to whether defendants entered into a conspiracy. To make such a showing, [the plaintiff] must offer significant probative evidence which tends to exclude the possibility that the alleged conspirators acted independently.

*Apex,* at 1257 (citations omitted).

The *Apex* court recognized that "[t]he sheer volume and desultory organization of the facts presented makes dissection of

[the plaintiffs] evidence an unenviable task, but it is an effort mandated by *Matsushita.*"

> It must be remembered throughout this exercise that an assumption of conspiracy is not the starting point after which each event must be explained away by the defendants. Rather, it is [the plaintiffs], now faced with unequivocable sworn denials, that must demonstrate that the evidence, construed in its favor, supplies an inference of conspiracy that is reasonable in light of any competing inference of independent conduct proffered by the defendants.

*Apex,* at 1259. The record in the case *sub judice* is also large and difficult, but the court must perform its duty under the applicable law.

## II.

### Substantive Antitrust Claims Against Defendants [6]

The court will address each of the plaintiffs' claims against the defendants. The court will address these claims in the order that they appear in the plaintiffs' amended complaint. Count I of the plaintiffs' amended complaint alleges antitrust violations against both the government and non-government defendants.

The court will first look at the nature of the legal claim, then detail the defendants' summary judgment challenges to this claim, and then finally analyze the plaintiffs' response of either making a legal argument or establishing specific evidence sufficient to create a genuine issue of material fact. After these steps are complete, the court will determine whether summary judgment is appropriate on that claim for the defendants or whether the plaintiffs have made a sufficient showing to preclude summary judgment.

### A. Denial of Access Claim

■ The first claim under Count I is that

---

6. Plaintiffs allege both federal and state antitrust claims. The court will only consider federal antitrust claims at this juncture. All State claims will be addressed in a subsequent section.

the private defendants[7] have denied the plaintiffs access to the multiple listing service in violation of antitrust laws. The plaintiffs allege that the National Association of Realtors, Inc. ("NAR") and the Mississippi Association of Realtors, Inc. ("MAR") should be held jointly liable for this antitrust violation because they have encouraged and enticed this behavior through their constitutions and by-laws.

### 1. No Denial of Board Membership

The private defendants responded to this claim by showing the court that the plaintiffs were not denied membership in the Monroe County Board of Realtors ("MCBR" or "Board of Realtors"), that the Popes voluntarily withdrew and are free to rejoin the Board of Realtors, and that membership in the Board of Realtors is nondiscriminatory. The private defendants argue that the MCBR may condition participation in the MLS upon membership in the MCBR without violating the federal antitrust laws.

The private defendants assert that the plaintiffs voluntarily withdrew from the Monroe County Board of Realtors and would again qualify for membership if they paid the required membership fees. The private defendants point out that Pope admitted in his deposition that he has no reason to believe that he fails to satisfy membership criteria.[8] The Popes unilaterally decided to leave the Monroe County Board of Realtors in 1981 over a dispute regarding dues assessments and their failure to be appointed to leadership positions within the Board of Realtors.[9] The parties have stipulated that the MCBR policy is that only members of the Monroe County Board of Realtors may participate in the multiple listing service.

The plaintiffs have not created an issue of material fact as to the availability of membership on the Board of Realtors for the Popes. Based upon the record before

the court and the complete failure of the plaintiffs to provide sufficient evidence to support their position, the court finds that a genuine issue of material fact is absent concerning the Popes access to the Monroe County Board of Realtors.

### 2. Membership Requirements Satisfy Rule of Reason

The Fifth Circuit has held that a concerted denial of access to a multiple listing service, when board members have agreed to pool and share their listings, amounts to a group boycott of the non-member. *Realty Multi–List*, 629 F.2d at 1361. However, in the case *sub judice*, the plaintiffs have failed to establish sufficient evidence that they were in fact denied participation in the multiple listing service.

The plaintiffs are not in a good position to argue that the membership requirements of the MCBR are unreasonable or discriminatory. The plaintiffs have failed to establish that they would be excluded from board membership or denied participation in the multiple listing service if they were willing to pay membership dues assessments.

The court's inquiry is whether membership on the Board of Realtors is available to the Popes on a non-discriminatory basis. The defendants argue that the plaintiffs have in essence conceded this issue by voluntarily withdrawing from the board and that the membership criteria are entirely fair and reasonable, including the pro rata dues formula. In response, the plaintiffs claim that they were "forced out" of membership and did not voluntarily withdraw.[10] Pope concluded that the pro-rata membership dues were intended to exclude him from membership and were discriminatory.[11] Conclusory statements, even those in the form of an affidavit, do not satisfy rule 56's requirement of specific facts. The plaintiffs have not shown that they were

---

7. Defendants Monroe County Board of Realtors, Inc., Joyce B. Murphy, Phil Roberts, Jack Francis, and Mary Lib Francis.

8. *See* deposition of James Pope at 157.

9. *See* deposition of James Pope at 157.

10. *See* affidavit of James Pope at 3–6.

11. *See* affidavit of James Pope at 3–5.

"forced out" in a discriminatory manner or that the dues formula is discriminatory.

The court should apply the "rule of reason" in determining whether an antitrust violation occurred by virtue of MCBR requirements. "Per se" treatment is not proper in such a situation. *See Realty Multi–List,* 629 F.2d at 1362. Price fixing and other antitrust violations are treated as per se illegal, but non-price restrictions are judged under the "rule of reason". The "rule of reason" analysis requires a "weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition." *Monsanto,* 465 U.S. at 761, 104 S.Ct. at 1469, 79 L.Ed.2d at 784.

In *Realty Multi–List,* the Fifth Circuit found that the challenged membership criteria of a favorable credit report and a favorable business reputation were antitrust violations under the rule of reason. *See Realty Multi–List,* 629 F.2d at 1376–1381. *Realty Multi–List* also held that a stock purchase requirement and sizeable membership fee were financial barriers that had such anti-competitive potential that they should be held unreasonable. *Realty Multi–List,* 629 F.2d at 1386. However, membership criteria which are reasonably necessary and narrowly tailored toward a valid interest may be justified in competitive terms and satisfy the rule of reason.

"[T]he fact finder weighs all of the circumstances of a case in determining whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568, 580 (1977). The Supreme Court noted a popular statement of the rule of reason using the words of Justice Brandeis as follows:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court

must ordinarily consider the facts peculiar to the business to which the restraint is applied; its conditions before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683, 687 (1918).

*Realty Multi–List* recognized that "brokers may require some insurance that they will not be endangered legally or ethically by brokers with whom they enter a listing —sharing agreement.... Membership criteria reasonably necessary to insure this protection, and narrowly tailored to this end, may thus be justified in competitive terms and able to survive at least facial review." *Realty Multi–List,* 629 F.2d at 1377.

Pope admits that he has no reason to believe that he would be denied membership,[12] thus, any claim of denial on a discriminatory basis is severely diminished. This indicates to the court that the plaintiffs do not have a sufficient evidentiary basis under Rule 56 for their claim of discriminatory exclusion from membership. It is undisputed that the Popes would be allowed board membership and that they meet all membership requirements.[13]

The plaintiffs claim that, even though they could become members of the MCBR, they are still discriminated against because of the dues formula used by the board. The plaintiffs' basic claim is that because of the large size of their realty organization, they bear a heavy burden under the

---

12. *See* deposition of James Pope at 157.

13. *See* deposition of James Pope at 157 and affidavit of Joyce Murphy at ¶ 8.

dues formula.[14] The Board of Realtors decided to charge a certain fee for each realtor member and also for each realtor associate member and sales person instead of charging one set fee for each realty organization. Pope claimed that this was an attempt to discriminate against him and that "the economic burden was being shifted to my shoulders alone" and was being done to exclude him from membership.[15] Pope's conclusory opinion is insufficient to satisfy Rule 56's requirements of specific facts and sufficient evidence.

*Realty Multi–List* addressed the issue of whether membership fees could be considered a barrier to membership in a private realty organization.

> Noting that RML has established no objective criteria for determining a reasonable purchase price [for the stock required to be a RML member], the Government argues that this rule is invalid on the theory that, in cases such as this one, the unrestricted power to set an entrance fee which is unrelated to either the cost of the service provided or the cost of maintaining the service as a going concern is the power to exclude, and hence to destroy competition. We agree. Doubtlessly, RML must be allowed to establish fee schedules which allow it to recoup its costs of operation and to maintain its viability as a going concern. Among these costs which it must be allowed to recover are the start-up costs involved in serving a new member. In addition, it is reasonable to assess a new member a *pro-rata* contribution toward the maintenance and the development of RML, including the accumulation of reasonable reserves. To require more than this, however, is to create problems. A sizeable membership fee which bears no

relation to the cost factors outlined above may not only create a significant barrier to new entry into the association, but may create "a strong inference that the amount has been set up as a barrier against" new applications.

*Realty Multi–List,* 629 F.2d at 1385–1386.

Private organizations often charge membership fees on a pro-rata basis. This practice distributes the organizations' expenses among all persons who receive either direct or indirect benefits of the organization. Both NAR and MAR assess dues to benefits of the organization. Both NAR and MAR assess dues to member boards of realtors, such as the MCBR, based upon the number of persons who benefit from the national and state associations. Each realtor, realtor associate who belongs to the local board, and salesperson licensee affiliated with the realtor's firm, who is not even a member of the board of realtors, increases the liability of the member boards.[16] The dues formula chosen by the local board of realtors is reasonable given their own dues requirements from the state and national organization and the nature of their local expenses. The plaintiffs have failed to produce probative evidence sufficient to establish that the dues formula was unreasonable or discriminatory. The plaintiffs have asserted that the local dues formula did change during this period, but this fails to establish evidence that the dues were unreasonable and it is uncontested that both the NAR and MAR dues formulae were adopted in their current form in 1972.[17]

The MCBR's membership dues formula charged real estate firms an amount based upon their actual size as measured by the

---

**14.** The plaintiffs have stated that they, or their sales people, will have to pay a total of approximately $2,000 in annual membership dues under the MCBR fee schedule and that this amount is approximately 50% of the MCBR dues revenue. When the plaintiffs first joined the MCBR, the membership fee was $146 for every Realtor (principle broker) and $121 for every member associate and non-member salesperson (all sales persons working for the principle broker's firm). *See* affidavit of James Pope at 3.

**15.** *See* affidavit of James Pope at 3.

**16.** *See* affidavit of Thad Vann, ex. B, By-laws, Art. X, § 1, p. 15 ($65 per Realtor and $40 per other salesperson licensee); affidavit of William North, ex. A., By-laws, Art. II, § 1 (A), p. 15 ($41 per Realtor and licensee).

**17.** *See* supplemental affidavits of William North at ¶ 24 and Thad Vann at ¶ 4.

number of realtors and sales people with a realtor's firm. The plaintiffs have not established sufficient evidence to create an issue of fact concerning exclusion from MCBR or the reasonableness of membership fees. The plaintiffs have not shown the court that the membership dues schedule was anti-competitive by being discriminatory or unreasonable. *Realty Multi-List* expressly allowed for a "pro-rata contribution toward the cost of the maintainence and the development of [the private realty organization], including the accumulation of reasonable reserves." *Realty Multi-List*, 629 F.2d at 1386. In a similar antitrust case, a court stated that the "[p]laintiff's claim is thus not that it was excluded from membership in [the private organization] completely, but that it was excluded at anything but the [desired] price."[18] *Ralph C. Wilson Indus., Inc. v. American Broadcasting Companies, Inc.*, 598 F.Supp. 694, 709 (N.D.Cal.1984); *aff'd* 794 F.2d 1359 (1986). The evidentiary record in this case does not establish a conspiracy to exclude the Popes or any discrimination in the membership fee schedule or other requirements for membership of the MCBR. The court finds that the plaintiffs have not produced sufficient evidence to establish a genuine issue of material fact concerning whether they were discriminated against or denied membership in the case *sub judice*.

3. MLS is Exclusive Service of MCBR

The court's next inquiry is whether board membership may be required for participation in the MLS under the antitrust laws. There is no material issue of fact on this requirement because the defendants admit that only board members may participate in the multiple listing service. The plaintiffs claim that limiting the service to board members violates the antitrust laws.

A multiple listing service is only a vehicle through which real estate brokers invoke cooperation in the sale of real estate by extending offers of sub-agency to one another.

More fundamentally, the sharing of listings is the essence of the multiple listing concept. The listing broker retains the primary fiduciary responsibility, with its legal and ethical ramifications, to the property owner. (citations omitted) Without some insurance that the brokers who act as sub-agents to the listing broker through the listing service are responsible and competent, it is possible that neither brokers nor the public will utilize the service, thus forfeiting the benefits it may yield to all.

*Realty Multi-List*, 629 F.2d at 1369.

The undisputed facts are established. The critical legal question is whether requiring board membership to participate in MLS satisfied the "rule of reason" standard or is a violation of the antitrust laws. May the MCBR provide the MLS as an exclusive service for members and deny MLS participation to non-members? A private organization may limit its services to its members as long as there is no arbitrary exclusion from membership, even where the services are economically necessary. *Associated Press v. United States*, 326 U.S. 1, 21–23, 65 S.Ct. 1416, 1425–26, 89 L.Ed. 2013, 2031 (1944); *aff'g, United States v. Associated Press*, 52 F.Supp. 362 (S.D.N.Y.1943).

A number of sister courts have addressed this issue. "The defendant realtors are all members of a voluntary trade association and as such may properly exclude any non-member from participation in its activities. Such exclusion does not constitute a violation of the antitrust laws." *Martin Trigona v. National Association of Realtors*, 1978–1 Trade Cases (CCH) ¶ 61,915 (E.D.Ill.1978) [available on WEST-LAW, 1978 WL 1310]. *See also Brown v. Indianapolis Board of Realtors*, 1977–1 Trade Cases (CCH) ¶ 61,435 (S.D.Ind.1977) [available on WESTLAW, 1977 WL 1405]

---

**18.** In *Wilson,* the defendants offered evidence to show the absence of a conspiracy and the court granted summary judgment. The court concluded by stating that "the record shows that plaintiff is unwilling to pay the going market price [for services], and is seeking redress from this grievance by means of an antitrust suit. This is not the purpose of antitrust laws. Antitrust laws were designed to protect free market competition, not the financial success of any particular competitor." *Wilson,* 598 F.Supp. at 710.

*Murphy v. Alpha Realty, Inc.*, 1978–2 Trade Cases (CCH) ¶ 62,388 (N.D.Ill.1978) [available on WESTLAW, 1978 WL 1451].

The reasoning of these district court cases is derived in part from *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013. *Associated Press* concluded, in a summary judgment posture, that the arbitrary exclusion from membership in an association providing services and facilities essential to effective competition is unlawful, but that an association may lawfully limit its services and facilities to its members where there are no restrictive membership arguments. *Associated Press*, 326 U.S. at 8–12, 21–23, 65 S.Ct. at 1418–21, 1425–26, 89 L.Ed. at 2023–2026, 2031–2032. *Associated Press* temporarily enjoined the observance of the agreement restricting services to members until the private organization complied with the court decree requiring non-restrictive membership requirements. *Associated Press*, 326 U.S. at 22, 65 S.Ct. at 1425, 89 L.Ed. at 2031.

In the underlying district court decision, Judge Learned Hand reasoned that "taken by themselves, and apart from restrictions upon membership, both agreements [limiting services to members] would be valid; it is essential to the protection of the main purpose that the members who [participate in this service] shall not destroy the value of [the service by making it available to non-members]." *Associated Press*, 52 F.Supp. at 374. The Supreme Court upheld the district court, indicating that an organization may lawfully limit its services and facilities to its members. *Associated Press*, 326 U.S. at 21–23, 65 S.Ct. at 1425–26, 89 L.Ed. at 2031–2032. The Supreme Court did not allow competing non-members to by-pass membership but required the private organization to open up membership to these non-members.

Many state courts which have addressed this issue have held that a board of realtors may limit participation in its MLS to its members so long as membership on the board is open to all persons licensed as brokers on reasonable and non-discriminatory terms. The court finds one such case very persuasive. *State ex rel Miller v. Cedar Rapids Board of Realtors*, 300 N.W.2d 127 (Iowa 1981). In the *Cedar Rapids* case, the state attorney general sued a realtor organization alleging that the board's requirement that MLS participants must be members of the local Board of Realtors violated the state antitrust laws, which were patterned after the federal antitrust laws. The attorney general took the position that the board's membership requirements were illegal, even if board membership was freely available to any real estate broker willing to join the board and pay membership dues. The Iowa Supreme Court applied the "rule of reason" of antitrust case law and held that the realty organization was not required by the antitrust laws to provide services to non-members. The court's reasoning is very persuasive:

> The alleged evil the State identifies is that a few [local] brokers—two were produced at trial—want access to the MLS without the "unnecessary barrier" of Board membership. The remedy sought is removal of "the price of admission to a non-related activity," i.e., Board membership and fees, because one broker testified MLS access is an "economic necessity." ... The State's proposed solution would give a few competitors a monetary advantage over the MLS brokers whose organizing ability, money, and volunteer time has made the service a viable tool for effective selling. Judge Learned Hand's admonition is relevant: "The successful competitor, having been urged to compete must not be turned upon when he wins." *United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2nd Cir.1945).

> A different case would be presented if brokers were unreasonably denied membership in the board and, consequently, access to the MLS. But here, unlike the government in *United States v. Realty Multi–List, Inc.*, 629 F.2d 1351, 1358 (5th Cir.1980), the State conceded the membership requirements of the board were reasonable.

. . . . .

So long as board membership is available to all on a non-discriminatory basis as this record indicates, we will not compel this private trade association to share one of its membership benefits with brokers who, for whatever personal or business reasons, declined to join.

*Cedar Rapids*, 300 N.W. 2d at 129–130, 131.

In opposing summary judgment on this issue, the plaintiffs rely heavily on *Realty Multi–List*. The court finds this case very instructive but cannot agree that it precludes summary judgment in the case *sub judice*. *Realty Multi–List* held that "[a] concerted denial of access to RML's listing service, when RML members have agreed to pool and share their listings, amounts to a group boycott of the non-member." *Realty Multi–List*, 629 F.2d at 1361. However, the real issue presented in the case *sub judice* is not whether the membership requirements are discriminatory against the Popes or exclude the Popes, but whether simply requiring membership to participate in the MLS violates the "rule of reason." [19]

*Realty Multi–List* did rely on a Supreme Court decision which allowed non-members to use the facilities of a private organization on just and reasonable terms, but failed to indicate that this separation of membership from services might be required in the context of a multiple listing service.[20] Instead, the Fifth Circuit emphasized that the private organization must permit applicants to become members.

Moreover, RML must be allowed to recover the actual cost of its continuing services to *members*, just as it does now. RML's present stock purchase rule, how-ever, is without justification in its competitive needs, and the district court erred in approving it. (emphasis added)

*Realty Multi–List*, 629 F.2d at 1387. The Court was mandating open membership and requiring that the membership fees not be a barrier to participation in the multiple listing service. *Realty Multi–List*, 629 F.2d at 1387. The Fifth Circuit has not indicated that the requirement of membership should be thrown out entirely but instead held that membership *requirements* must be reasonable.

Other courts have applied *Realty Multi–List* in a limited way or have recognized that *Realty Multi–List* does not control when the reasonableness of membership criteria is not at issue. *Cedar Rapids*, 300 N.W.2d at 130; *see also Pomanowski v. Monmouth County Board of Realtors*, 89 N.J. 306, 446 A.2d 83, 91 (N.J.); *cert. denied* 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealer's Advertising Ass'n., Inc.*, 672 F.2d 1280, 1286–1287 (7th Cir.1982).

The plaintiffs have attempted to rely upon California state cases which hold that where MLS access has been shown to be a practical economic necessity for survival in a real estate brokerage market, the MLS must automatically be made available without the requirement of board membership. *Marin County Board of Realtors v. Palsson*, 16 Cal.3d 920, 130 Cal.Rptr. 1, 549 P.2d 833 (1976). Even if the Fifth Circuit adopted the California reasoning that board membership should not be required where MLS participation is a practical economic necessity, the plaintiffs have failed to show

---

**19.** The exclusion of non-members from MLS participation need only satisfy the rule of reason. The requirement of membership to enjoy MLS participation is not a per se antitrust violation.

A practice is "plainly anticompetitive" and lacking in "any redeeming virtue" under the Sherman Act, therefore, when it can further none of the Act's goals—when it operates to deny to consumers the opportunity to choose among alternative offers without offering the possibility of any joint, efficiency-producing economic activities.

**20.** The organization in the case mentioned voluntarily provided services to some non-members, but did so in a discriminatory manner. The Supreme Court ordered the reform of organizational rules to allow competitors to use the facilities on equal terms. *United States v. St. Louis Terminal Railroad Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (explained in *Realty Multi–List*, 629 F.2d at 1386).

*Realty Multi–List*, 629 F.2d at 1364 (citing *Broadcast Music, Inc. v. Columbia Broadcasting Co.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979)).

that participation in the MLS is a practical economic necessity for the survival of their business. In fact, the plaintiffs have failed to produce evidence of any meaningful impact upon their ability to do business in the case *sub judice*.[21]

*Associated Press, Realty Multi-List* and other decisions guiding this court do not indicate that MCBR membership and participation in the MLS should be separated from each other. The court recognizes that the MLS is a service provided by MCBR. Considering the entire evidentiary record, the court finds that the plaintiffs have failed to produce sufficient evidence to establish a genuine issue of material fact to preclude summary judgment. The court therefore finds that the requirement of membership to participate in the MLS is not a violation of the antitrust laws in the case *sub judice*.

### 4. No Showing of Market Power

Under the rule of reason, the court must not only consider the validity of the competitive justification given for the restraint imposed, but it also must determine the market power of the combination.[22] Therefore, the court has the power to void "any significantly restrictive rule of a combination or trade association with *significant market power, which lacks competitive justification* or whose reach clearly exceeds the combination's legitimate needs." *Realty Multi-List*, 629 F.2d at 1370 (emphasis supplied). The plaintiffs have not established that the MLS has significant market power in the case *sub judice*.

The plaintiffs have conceded that they sell 70% to 80% of their own listings "in house" because it is more profitable to sell their own listings.[23] These "in house"

sales have no connection to either the MLS or the private defendants. The plaintiffs have also conceded that they have access to the listings of Murphy and Roberts completely apart from any participation in the MLS.[24] The parties have stipulated that Pope's Realty–Century 21 has provided monthly financial information to a regional Century 21 office. Based upon this information, Raymond Micsan, director of the Century 21 regional office, stated that the plaintiffs enjoy a "normal" ratio of "in house" to cooperative sales for similarly situated Century 21 francises,[25] despite their non-participation in the board's MLS.

The plaintiffs have not come forward with specific evidence to demonstrate that their non-participation in the MLS has had any appreciable effect on their ability to engage in cooperative sales or to remain generally competitive in the Monroe County real estate market. The Supreme Court has emphasized that the legality of arguable anti-competitive conduct should be judged primarily by its "market impact." *Monsanto*, 465 U.S. at 762, 104 S.Ct. at 1470, 79 L.Ed.2d at 784; *see also Realty Multi-List*, 629 F.2d at 1370. The plaintiffs have failed to show any market effect from these allegedly anti-competitive restraints.[26] The court also recognizes that participation in the MLS does not insure cooperation with each participant of the MLS. Even if participation in the MLS was open to the plaintiffs without the standard fee or membership in MCBR, the individual participants could still decline to cooperate with the plaintiffs or to cease their MLS participation altogether.[27] This possibility would clearly have an anti-competitive impact on the real estate market.

---

**21.** *See* discussion of market effect below at II(A)(4).

**22.** The market power requirement applies to other antitrust claims as well.

**23.** *See* deposition of James Pope at 174–175.

**24.** *See* deposition of James Pope at 219, 221–222.

**25.** *See* deposition of Raymond Micsan at 22–23.

**26.** The plaintiffs have also failed to show an antitrust injury from these allegedly anti-com-

petitive restraints. They have not come forward with specific probative evidence of sales which they have lost and they have not shown any statistical evidence to indicate an injury. To the contrary, the evidence tends to show that the plaintiffs' sales ratio has been unaffected. *See* deposition of Raymond Micsan at 22–23. *See also* discussion at II.C.2.

**27.** *See* affidavit of William North at ¶ 9; *see* discussion of *Colgate* doctrine at II.B. below.

Under the rule of reason, a showing of anti-competitive market effect is an essential predicate for antitrust liability. *Monsanto*, 465 U.S. at 762, 104 S.Ct. at 1470, 79 L.Ed.2d at 784; *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, 687 (1918). The Seventh Circuit has stated the rule as follows:

> It is by now well established that any rule of reason analysis requires a showing of anti-competitive market effect. To hold otherwise would ignore the very purpose of the anti-trust laws which were enacted for the protection of competition, not competitors.

*Phil Tolkan Datsun*, 672 F.2d at 1287 (quoting *Lektro—Vend Corporation v. The Vendo Co.*, 660 F.2d 255, 268 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982)).

The plaintiffs have failed to provide specific evidence to demonstrate an anti-competitive market effect. The plaintiffs have not created an issue of fact regarding this challenge to their claim. The defendants are entitled to summary judgment on the denial of MLS participation claim and all antitrust claims on the ground that the plaintiffs have failed to establish market effect. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2553, 91 L.Ed.2d at 273.

### 5. No Effect on Interstate Commerce

The federal antitrust laws regulate interstate commerce and not local intra-state commerce.[28]

> [J]urisdiction may not be invoked under [the Sherman Act] unless the relevant aspect of interstate commerce is identified; *it is not sufficient to rely on identification of a relevant local activity and to presume an interrelationship* with some unspecified aspect of interstate commerce. To establish jurisdiction a plaintiff must allege the critical relationship in the pleadings and if these allegations are controverted *must proceed to demonstrate by submission of evidence* beyond the pleadings either

that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce. *Gulf Oil Corp. v. Copp Paving Co.*, supra, [419 U.S. 186] at 202, 42 L.Ed.2d 378, 95 S Ct 392. [402]

*McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441, 450 (1980) (emphasis supplied). The plaintiffs do not have to show that the alleged activity effected interstate commerce, but they must "demonstrate a substantial effect on interstate commerce generated by [the defendants'] brokerage activity." *McLain*, 444 U.S. at 242, 100 S.Ct. at 509, 62 L.Ed.2d at 451.

The plaintiffs had the responsibility of coming forward with evidence to demonstrate that the defendants' activity was either in interstate commerce or had a substantial effect on interstate commerce, because the defendants expressly challenged jurisdiction on this basis. The plaintiffs have failed to come forward with any evidence to demonstrate an effect on interstate commerce.

*McLain* did hold that the broker organization in the case before the court had an effect on interstate commerce through the utilization of out-of-state bank financing and national title insurance. *McLain*, 44 U.S. at 245, 100 S.Ct. at 510, 62 L.Ed.2d at 452. However, the plaintiffs have not demonstrated that the broker organization in Amory will have the same "substantial effect" on interstate commerce as did the large New Orleans organization in *McLain*. The plaintiffs have not established that out-of-state banks or title insurance companies were used or that this connection to interstate commerce would be sufficient in the case *sub judice*.

The Fifth Circuit refused to broaden the holding of *McLain* to presume a substantial effect on interstate commerce by every real estate organization.

---

**28.** The requirement of a substantial effect on interstate commerce applies to other antitrust claims as well.

In the present action, appellants seek to employ *McLain* as an umbrella underneath which any business having the most tangential relationship with the real estate business would be presumed to have a substantial effect on interstate commerce. *McLain* does not stand for that proposition, and that is not the law. *Alabama Homeowners, Inc. v. Findahome Corp.*, 640 F.2d 670, 673 (5th Cir.1981). The Fifth Circuit recognized that *Realty Multi–List* presented the issue of whether or not the local multiple listing service had a "sufficient connection to interstate commerce to invoke Sherman Act jurisdiction" but found it unnecessary to decide the issue. *Realty Multi–List*, 629 F.2d at 1389. These authorities indicate to the court that antitrust plaintiffs continue to have a responsibility to present evidence on this issue and that plaintiffs may not "presume an interrelationship" with interstate commerce. The plaintiffs have not produced evidence to create a genuine factual dispute on this issue pursuant to Rule 56. The defendants are entitled to judgment as a matter of law on all antitrust claims on the ground that interstate commerce was not involved and therefore the court has no "Sherman Act jurisdiction." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2553, 91 L.Ed.2d at 273.

### B. Group Boycott Claim

[10, 11] The plaintiffs' second claim of Count I is that the private defendants instituted a group boycott against the plaintiffs by collectively refusing to permit the plaintiffs to show property listed with these private defendants. The defendants challenge this allegation as devoid of evidentiary support and demand that the plaintiff prove that the defendants' alleged refusal to deal with him, or boycott of him, was the result of joint or concerted action undertaken pursuant to a common scheme, understanding, or grievance.

The defendants did allow the plaintiffs to show listed properties during this time period and did cooperate with the plaintiffs, except for Mr. and Mrs. Francis. The plaintiffs' own depositions fail to establish specific facts that the defendants have unilaterally refused to deal with the plaintiffs, much less boycotted the plaintiffs. Even if such activity did exist, the plaintiffs would be required to prove that this activity was the result of a common scheme, understanding, or agreement and not the result of independent action.

Each individual defendant had a "unilateral right" to refuse to deal with the plaintiffs for reasons sufficient to themselves. *Aladdin Oil*, 603 F.2d at 1113. The Supreme Court has held as follows:

> The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

*United States v. Colgate and Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992, 997 (1919). Although somewhat narrowed through the years, the *Colgate* doctrine remains viable in antitrust law and still allows "individual sellers to refrain from dealing, even though the condition for dealing would otherwise violate the antitrust laws." *Aladdin*, 603 F.2d at 1114. The refusal to deal becomes unlawful only when it produces an unreasonable restraint on trade and there exists "an anti-competitive purpose or effect in selecting those with whom one will deal." *Aladdin*, 603 F.2d at 1115.[29]

29. The Fifth Circuit has noted that:
[A] company, acting unilaterally, has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself. Proof of parallel behavior alone does not establish a prima facie case of a violation of the Sherman Act. In order to avoid a motion for summary judgment, a claimant

The Fifth Circuit has clearly held that the plaintiff must prove five elements to establish liability for a boycott conspiracy under Section 1 of the Sherman Act and Section 4 of the Clayton Act. *Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1059 (5th Cir.1985), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). "[A] plaintiff must prove: (1) that a conspiracy to boycott existed; (2) that the defendants participated in a conspiracy; (3) that the conspiracy had a sufficient nexus with interstate commerce; (4) that the conspiracy injured the plaintiff; and (5) the approximate amount of damages."

The Fifth Circuit upheld a summary judgment in *Aviation Spec., Inc. v. United Technologies Corp.*, 568 F.2d 1186 (5th Cir. 1978) in which the plaintiff failed to show a conspiracy. In that case, the plaintiff stipulated that they had no direct evidence that the refusal to deal was anything more than a unilateral business decision or that there were any agreements beyond typical distributorship agreements. As in the case *sub judice*, the defendants denied the existence of a conspiracy and thus shifted the burden to the plaintiffs to produce significant probative evidence of a conspiracy and participation by the defendants in the conspiracy. As in the case *sub judice*, the plaintiffs relied upon circumstantial evidence. *See First National Bank v. Cities Service Co.*, 391 U.S. 253, 291, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569, 593 (1968); *Solomon v. Houston Corregated Box Co.*, 526 F.2d 389, 396 (5th Cir.1976). The Fifth Circuit held that the plaintiffs had to do far more than show parallel business behavior to establish evidence of a violation of the Sherman Act and thereby avoid summary judgment. The court then proceeded to point out that the plaintiffs' assertion rested upon its own "unsupported assessment of the situation, which is insufficient to

raise a genuine issue of material fact concerning whether the refusal was premised upon a good faith business judgment." *Aviation Specialties*, 568 F.2d at 1192.

The plaintiff has the burden of coming forward with specific evidence of a conspiracy in order to survive summary judgment on the boycott claim. Conspiratorial conduct may not be proven by circumstantial evidence unless such circumstantial evidence excludes the possibility of independent action. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471, 79 L.Ed.2d at 785.

The uncontroverted testimony of Raymond G. Micsan, the director of the Century 21 regional office, establishes that Century 21–Popes' Realty engaged in cooperative transactions with other brokers throughout the period at issue in this litigation.[30] The plaintiffs admit that Murphy and Roberts have not boycotted the plaintiffs or refused to deal with the plaintiffs.[31] In addition, the plaintiffs admit that they do not have any direct evidence of any conspiracy or agreement between any two defendants to refuse to do business with Century 21–Popes' Realty.[32]

The plaintiffs have failed to provide sufficient probative evidence to create a genuine issue of fact on the conspiracy element or the other four elements necessary to the boycott claim. *Park*, 764 F.2d at 1059. The defendants are entitled to judgment as a matter of law on the boycott claim.

## C. Price Fixing Claim

The plaintiffs have claimed that the defendants have conspired to fix prices, i.e., set commission rates, although such a charge is not found in one particular charge of the amended complaint. The defendants challenge this claim of the plaintiffs because they failed to produce any evidence of price fixing and because the

---

must come forward with significant probative evidence supporting its theory of conscious parallelism with, as it has been stated, some "plus" factor which tends to indicate that the asserted unilateral behavior was not such in fact, e.g., that the decisions not to deal were contrary to defendants' economic self interest so as to raise an issue of good faith business judgment.

*Paul Kadair*, 694 F.2d at 1027. (citations omitted)

**30.** *See* deposition of Raymond Micsan at 22–23.

**31.** *See* deposition of James Pope at 219, 221–222.

**32.** *See* deposition of James Pope at 224–225.

plaintiffs lack standing to sue for price fixing. The plaintiffs have supported their price fixing claim by attempting to show retaliatory conduct, tossing out the *Monsanto* case, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775, and arguing that standing requires nothing more than "injury in fact" in an antitrust situation.[33]

### 1. No Evidence of Price–Fixing Agreement

■ The starting point for the court is the recognition that the plaintiffs bear the burden of producing probative evidence sufficient to support a finding of an unlawful contract, combination, or conspiracy.

> On a claim of concerted price fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement. If an inference of such an agreement may be drawn from highly ambiguous evidence, there is a considerable danger that the doctrines enunciated in *Sylvania* and *Colgate* will be seriously eroded.
>
> . . . . .
>
> Thus, something more than evidence of complaints is needed. There must be evidence that tends to exclude the possibility that the [defendant] manufacturer and [defendant] nonterminated distributors were acting independently. As Judge Aldisert has written, the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others "had a conscious commitment to a common scheme designed to achieve an unlawful objective."

*Monsanto,* 465 U.S. at 763–764, 104 S.Ct. at 1470–71, 79 L.Ed.2d at 785–786.

In *Monsanto,* the Supreme Court held that the direct and inferential evidence was sufficient to enable the fact-finder to conclude that there was an agreement for conspiracy to maintain prices. However, in the case *sub judice* plaintiffs have failed to make a sufficient showing of either a conspiracy or the participation of these defendants in such a conspiracy. The plaintiffs themselves have stipulated the following: "Plaintiffs are aware of no written or oral agreement between Roberts, Murphy, and Jack and Mary Lib Francis to charge a uniform rate of six percent for the commissions or to charge a uniform split among participating salesmen" and that the MAR "does not have any written policy that fixes, establishes, or recommends a rate of commission that its members should charge sellers, or that fixes, establishes or recommends a rate of commission split that members should pay to each other or other real estate licensee."[34] The plaintiffs offer no specific facts to demonstrate the existence of a conspiracy or price agreement. Pope's conclusory statement that the defendants' had made "statements" that they would not cooperate with the plaintiff unless the plaintiff stopped advertising their "cut rates" is insufficient to create a genuine issue of material fact.[35]

In contrast, the defendants' affidavits prove that the NAR, MAR, and MCBR strictly forbid price fixing by their members.[36] The plaintiffs have admitted that they do not have any evidence to suggest otherwise.[37] Murphy, Roberts, and Francis state in their affidavits that these defendants have never conspired to fix real estate brokerage commissions.[38] The plaintiffs concede the absence of proof of a conspiracy among the individual defendants.[39]

The plaintiffs have failed to establish a price fixing conspiracy or price fixing agreements between parties. The circumstantial evidence of parallel behavior does not exclude the possibility of independent action and is not sufficient probative evidence of conspiratorial conduct. *Monsanto,* 465 U.S. at 768, 104 S.Ct. at 1473, 79

---

33. *See* plaintiffs' brief at 11–12.

34. *See* pretrial order at 11–12 (UU, PP).

35. *See* affidavit of James Pope at 1, 6–7.

36. *See* affidavit of William North at ¶ 20; Thad Vann at ¶¶ 6, 7, 8, 9; and Joyce Murphy at ¶ 12.

37. *See* deposition of James Pope at 172–174.

38. *See* affidavits of Joyce Murphy, ¶ 19, exs. D–F; Phillip Roberts, ¶¶ 6, 9, exs. A–F; Mary Lib Francis, ¶¶ 7, 9 exs. A–C.

39. *See* deposition of James Pope at 171.

L.Ed.2d at 788. The Supreme Court made itself perfectly clear when it stated that:

> [*Monsanto* ] held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy (citations omitted). To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. (citations omitted) Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inference of independent action or collusive action that could not have harmed respondents.

*Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1357, 89 L.Ed.2d 553. The plaintiffs must also show the defendants individual participation in the conspiratorial conduct. The Fifth Circuit has found the existence of a conspiracy but then found the testimony wholly inadequate to support an inference of conspiracy between the supplier and distributors other than the plaintiff. *Joe Regueira, Inc. v. American Distilling Co.*, 642 F.2d 826, 832 (5th Cir.1981). The plaintiffs have failed to show either the existence of a conspiracy or participation by any of these defendants in a conspiracy.

The plaintiffs have failed to establish proof of conspiratorial conduct as required by the Sherman Act. Parallel business behavior does not, as a matter of law, prove a conspiracy. *Aviation Specialties*, 568 F.2d at 1192. The plaintiffs have not proved that individual private defendants have conspired to set uniform commission rates and the circumstantial evidence produced does not "exclude the possibility of independent action." The plaintiffs have also failed to produce any evidence to dispute the express policies of the NAR, MAR, and MCBR which forbid "fixing" commissions or commission splits.

The plaintiffs have not produced sufficient evidence to create a genuine issue of material fact on this claim. The defendants are entitled to judgment as a matter of law on the price-fixing claim.

### 2. Standing Requires Antitrust Injury [40]

█ The defendants also challenge the plaintiffs' price-fixing claim on the basis of the plaintiffs' failure to show an antitrust injury and therefore to show the existence of standing. The defendants point out that the plaintiffs could not possibly have been injured by any such conspiracy to raise commission rates. The simple economics of the situation indicate that the plaintiffs are actually benefitted because they are placed in a better competitive position with customers in relation to other brokers.

Injury is "the *sine qua non* for stating a cause of action by a private antitrust plaintiff." *Southern Concrete Co. v. U.S. Steel Corp.*, 535 F.2d 313, 318 (5th Cir.1976), *cert. denied*, 429 U.S. 1096, 97 S.Ct. 1113, 57 L.Ed.2d 543 (1977).

A private plaintiff's standing to sue for antitrust damages is governed by Section 4 of the Clayton Act, 15 U.S.C. § 15, which confers standing only on those persons who have been "injured in their business or property by reason of anything forbidden in the antitrust laws...." The Supreme Court has recognized further limitations on private antitrust claims for damages. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184, 193 n. 14 (1972); *Southern Concrete*, 535 F.2d at 316.

The Fifth Circuit uses the "target area" test to determine antitrust standing. Standing is different in an antitrust context.

> The "target area" test arose as a means of limiting the class of potential treble damage plaintiffs to those persons who could most adequately vindicate the purpose of the antitrust laws. To attain standing a person (whether corporation or individual) must be one against whom the conspiracy is aimed.

*Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir.1975). The Fifth Circuit has applied the test to deny standing to persons who cannot establish that they

---

**40.** The requirement of antitrust injury applies to other antitrust claims as well.

paid the allegedly fixed price. *Pan–Islamnic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 547 (5th Cir.1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). The Fifth Circuit has applied the "target area" test in *Park v. El Paso Board of Realtors,* 764 F.2d 1053 (5th Cir. 1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986), to a case involving real estate brokers just as in the case *sub judice.*

> The plaintiff alleged that the defendant-brokers set an artificially high price for commissions. However, it is difficult to see how this price-fixing, in itself, could have injured the plaintiff. Setting an artificially high price for a product potentially harms consumers; but normally one would not expect it to harm competitors who try to undercut the set price. Quite the reverse: price fixing ordinary helps these competitors by allowing them to capture a larger share of the market than they would if the prevailing price were lower.

*Park,* 764 F.2d at 1069.

The Supreme Court has used this same reasoning to reinstate summary judgment for defendants.

> Respondents cannot . . . recover damages for any conspiracy by petitioners to charge higher than competitive prices in the American market. Such conduct would indeed violate the Sherman Act . . ., but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price. . . . Such restrictions, though harmful to competition, actually benefit competitors by making supracompetitive pricing more attractive. Thus, [these various claims cannot] by themselves give respondents a cognizable claim against petitioners for antitrust damages.

*Matsushita,* 475 U.S. at 582–583, 106 S.Ct. at 1354–55, 89 L.Ed.2d at 549–550.

The plaintiffs have not produced sufficient evidence to create a genuine issue of fact on the standing challenge. The court finds that the plaintiffs do not have the necessary antitrust standing to bring this claim of an alleged conspiracy to fix real estate brokerage commissions and commission splits.

### D. Claims Related to the Private Defendants' Complaints to MREC and the Action taken by the Government Defendants

The plaintiffs' third claim under Count I is that the government defendants conspired with the private defendants to "punish" the plaintiffs for their competitive activities by way of the complaint procedure of the MREC. The plaintiff sets out specific complaints made to the MREC and the subsequent action taken by the MREC. The existence of these administrative complaints and the action taken by the government defendants are not in dispute. The private defendants claim that these complaints were not filed in order to "punish" the plaintiffs and that, even if they were, this action would be immune under the *Noerr–Pennington* doctrine. The government defendants claim to be immune.

#### 1. Challenge by Private Defendants

Defendants Murphy, Roberts, and the Francises do not dispute that the complaints were filed with the MREC and that the MREC took action based upon these complaints. However, these defendants point out that the record is utterly devoid of any evidence that any defendants improperly utilized the complaint procedures of the MREC to "punish" the plaintiffs for competing in the Monroe County real estate market or for any other reason. The plaintiffs have not set forth sufficient probative evidence to challenge the defendants' claim, but even if the plaintiffs had shown that this action was taken to "punish" the plaintiffs' behavior, or for other anti-competitive reasons, this conduct would still be expressly protected from antitrust attack by the *Noerr–Pennington* doctrine.

The Supreme Court has long recognized that First Amendment considerations compel the conclusion that antitrust laws do not apply to concerted action for the purpose of petitioning or attempting to influence governmental authorities. *Eastern*

*Railroad Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 135, 81 S.Ct. 523, 528, 5 L.Ed.2d 464, 470 (1961), *United Mine Workers v. Pennington,* 381 U.S. 657, 669–670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626, 636 (1965). The reasoning in these cases that concerted actions designed to influence governmental authorities is immune from antitrust challenge has come to be known as the *Noerr–Pennington* doctrine.

The Fifth Circuit interprets the *Noerr–Pennington* doctrine to exempt proceedings initiated before governmental agencies from the antitrust laws even if the proceedings are initiated for the express purpose of eliminating competition. *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1363 (5th Cir.1983). The antitrust laws do not apply to private efforts to petition governmental agencies.

> [T]he Supreme Court established the basic principle of antitrust petitioning immunity, that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act."

*Coastal States,* 694 F.2d at 1363.

The Supreme Court has created an exception to the *Noerr–Pennington* doctrine, but this so-called "sham" exception is limited in scope. *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533, 5 L.Ed.2d at 475; *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 511, 92 S.Ct. 609, 612, 30 L.Ed.2d 642, 646–647 (1972). "While the precise contours of these exceptions are as yet ill-defined, there appears to be agreement that both vexatious litigation and unlawful conspiracies with governmental officials are sham activities." *Greenwood Utilities Commission v. Mississippi Power Company,* 751 F.2d 1484, 1498 (5th Cir. 1985). The Fifth Circuit declared that "[o]nly where evidence shows that the defendant knew or should have known that the action he sought was improper would a court be justified in labeling his petitions a 'sham' ..." *Greenwood Utilities,* 751 F.2d at 1500.

The plaintiffs have not produced any specific evidence that the "sham" exception should apply to deny *Noerr–Pennington* immunity to these private defendants. There is no indication in the record that the defendants acted in a vexatious manner or that they conspired with government defendants in any way.

The plaintiffs have not provided evidence to create a genuine issue of material fact concerning the *Noerr–Pennington* challenge. The private defendants are entitled to judgment as a matter of law on this claim.

**2. Challenge by Government Defendants**

■■■ The MREC investigated the complaints and took disciplinary action against the plaintiffs based upon the private defendant's complaints.[41] The MREC, and the other government defendants who act for the MREC, have a mandate to enforce the standards of conduct that govern all persons licensed by the commission. Miss. Code Ann. § 73–35–21 (1972). The commission is required to follow specific proce-

---

**41.** The plaintiffs' claims against the MREC, undisputedly a state agency, are barred by Eleventh Amendment immunity. *See Edelman v. Jordan,* 415 U.S. 651, 662–663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662, 672 (1974); *Pennhurst State School v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67, 78 (1984); *McDonald v. Board of Mississippi Levee Com'rs.,* 832 F.2d 901, 906 (5th Cir.1987). The MREC commissioners are absolutely immune for acts that were quasi-judicial. Part of their functions are analogous to those of judges and prosecutors. *Nixon v. Fitzgerald,* 457 U.S. 731, 747, 102 S.Ct. 2690, 2700, 73 L.Ed.2d 349, 362 (1982); *see also Johnson v. Wells,* 566 F.2d 1016, 1018 (5th Cir.1978) (parole board immunity); *United States v. Irving,* 684 F.2d 494, 496 (7th Cir.1982). The MREC commissioners and staff also may utilize the protection of qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed. 2d 396, 410 (1982); *Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90, 103 (1974); *Baddour, Inc. v. United States,* 802 F.2d 801, 806–808 (5th Cir.1986). Immunity defenses apply to the First Amendment, due process, and equal protection claims as well.

dures in enforcing these standards to insure due process protections at the administrative level. Miss.Code Ann. § 73–35–23 (1972). In addition, a licensee disciplined by the commission is afforded a right of appeal to the Mississippi state courts. Miss.Code Ann. § 73–35–25 (1972). The plaintiffs have failed to produce sufficient evidence that the government defendants conspired with anyone to "punish" the plaintiffs for any reason whatsoever.

The government defendants argue that they are not subject to federal antitrust laws because of state action immunity. The Supreme Court has stated that the Sherman Act does not restrain state action or official action and established the state action exemption to the antitrust laws. *Parker v. Brown,* 317 U.S. 341, 350–351, 63 S.Ct. 307, 313–14, 87 L.Ed. 315, 325–326 (1943). The Fifth Circuit has long recognized that "neither the Sherman Act nor the Clayton Act was intended to authorize restraint of governmental action." *Saenz v. University Interscholastic–League,* 487 F.2d 1026, 1028 (5th Cir.1973); *Alabama Power Co. v. Alabama Electric Coop.,* 394 F.2d 672, 675 (5th Cir.), *cert. denied,* 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968). This shield of immunity protects governmental agencies as well as officers and agents of the state who are acting within the scope of their authority. *Saenz,* 487 F.2d at 1028.

The plaintiffs have failed to provide evidence to create genuine issues of material fact to preclude summary judgment for the government defendants on this critical element.[42] The government defendants are entitled to judgment as a matter of law on all federal antitrust claims.

**E. Claim that Private Defendants Prohibited the Use of the Term "Realtor"[43]**

The plaintiffs' fourth claim is that certain private defendants[44] have engaged in the unreasonable restraint of trade by placing "arbitrary limitations" upon the use of the term realtor. Plaintiffs claim that they are qualified to use the term realtor and that the defendants' actions preventing such use violated the First Amendment and antitrust laws. The plaintiffs claimed in their brief that realtor is a generic term which is not subject to copyright laws.

The parties have subsequently stipulated that NAR owns the federally registered trademark "realtor" and "realtors" which are proprietary trademarks that refer solely to persons who are members of NAR and who have subscribed to NAR's Code of Ethics. NAR licenses the right to use these terms to its member boards (such as MCBR) who in turn sub-license the right to use these terms to their individual members.

Securing registration of a trademark pursuant to the Lanham Act and endeavoring to police and protect one's rights in that trademark is not a violation of the antitrust laws. Under any possible set of facts, "the acts of [defendants] in registering and enforcing the trademark in issue ... merely represent fair and aggressive competition which does not constitute a violation of the antitrust laws." *Carr–Freshner Corp. v. Auto Aid Manufacturing Corp.,* 438 F.Supp. 82, 87 (S.D.N.Y.1977). The argument that the use and protection of a copyright under the Federal Trademark Statute, 15 U.S.C. §§ 1051–1127, violates the federal antitrust laws is clearly erroneous.

---

**42.** The court notes that the type of "anti-competitive restraint" challenged must be within the legislative intent. Although this is a factual determination, the plaintiffs have failed to come forward with either specific evidence or arguments to dispute the availability of a state action exemption. *Lafayette v. Louisiana Power and Light,* 532 F.2d 431, 434 (5th Cir.1976), *aff'd,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978).

**43.** The terms "Realtor" and "Realtors" are federally registered trademarks that refer solely to NAR members, according to the parties' stipulations. The court will use these terms with this definition in mind but will not use the registered trademark symbol of a circled R.

**44.** These defendants include the Monroe County Board of Realtors, Inc., Mississippi Association of Realtors and the National Association of Realtors.

The Popes have admitted that they were not members of the MCBR and were thus unable to be members of the MAR or NAR.[45] Therefore, the Popes' unauthorized use of the term "realtor" infringes upon NAR's trademark rights and these private defendants may take appropriate steps to enforce their trademark. The plaintiffs have not established a genuine issue of material fact sufficient to preclude summary judgment on this antitrust claim. The defendants are entitled to judgment as a matter of law on the issue of attempting to prevent the plaintiffs from using the protected trademark term "realtor".

The plaintiffs also claim that the enforcement of this trademark by private defendants violates the First Amendment. Private action cannot be the basis for a violation of the right to free speech, only government action. The plaintiffs have not shown that the private defendants' trademark is invalid because it is a generic term, or that, if it were, the result of this trademark's enforcement would be a First Amendment violation. *See San Francisco Arts and Athletics v. U.S.O.L,* — U.S. ——, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). The private defendants are entitled to judgment as a matter of law on the First Amendment claim.

### F. Claim that Defendants Prohibited Employment Discussions With Their Sales People

The plaintiffs' fifth claim of Count I is that the defendants have prohibited discussions by the plaintiffs with their sales people and that this violates antitrust laws and the First Amendment. The private defendants have challenged the factual basis of this claim through their affidavits. In response, the plaintiffs have failed to produce sufficient probative evidence to establish these allegations. The plaintiffs have not come forward with any specific facts that establish that any of the plaintiffs' activities concerning employment or employee communication policies are in violation of antitrust laws or the First Amend-

ment. The court does not find it necessary to exhaustively address a claim which has no factual or legal support. The defendants are entitled to judgment as a matter of law.

### G. Claim that Defendants Restricted Locations for Real Estate Courses

The plaintiffs' sixth claim of Count I is that the defendants have somehow prevented real estate courses from being taught at convenient locations. Although this allegation was challenged by the defendants through affidavits, the plaintiffs have not come forward with specific facts to support this allegation. The private defendants have asserted that they have no control over licensing requirements, the approval of real estate courses, or the location of these courses. Pursuant to Mississippi Code Annotated § 73-35-7, the courses must be approved by either the Southern Association of Colleges and Schools or the Realtors' Institute of Mississippi. The plaintiffs have not come forward with any specific facts to support this claim and have failed to create a genuine issue of material fact. The plaintiffs have also failed to articulate a colorable First Amendment or antitrust claim. The defendants are entitled to judgment as a matter of law.

### H. Claim of Tying Arrangement Between Sales of Insurance and Real Estate

The plaintiffs allege that Francis and Roberts have tied the selling of insurance to the listing of real property in violation of antitrust laws. Both defendants Roberts and Francis have expressly denied this allegation in their sworn affidavits.[46] The plaintiffs have not come forward with sufficient probative evidence to create a genuine issue of material fact on this claim. The court finds that the defendants are entitled to judgment as a matter of law. In a summary judgment posture, the plaintiffs must produce specific evidence to sub-

**45.** *See* deposition of James Pope at 157 and party stipulations.

**46.** *See* affidavits of Roberts at ¶ 20 and J. Francis at ¶ 7.

stantiate their claim in order to continue to trial.

## III.

### First Amendment Claims Against Government Defendants

The plaintiffs have alleged violations of the First Amendment by the government defendants in Count II. The court will give due consideration to each of these claims in the order in which they are presented.

Not all speech is constitutionally protected by the First Amendment. The Supreme Court has distinguished between commercial price and product advertising and ideological communication and has demanded a greater degree of protection for the latter form of speech. *Young v. American Mini–Theaters, Inc.,* 427 U.S. 50, 68, 96 S.Ct. 2440, 2451, 49 L.Ed. 310, 325 (1976). In *Central Hudson Gas and Electric Corp. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Supreme Court adopted a four-part test for determining the validity of government restrictions on commercial speech. This test was as follows: (1) the First Amendment protects commercial speech only if that speech concerns lawful activity and is not misleading; (2) a restriction on otherwise protected commercial speech is valid if it seeks to implement a substantial governmental interest, and (3) directly advances that interest, and (4) reaches no further than necessary to accomplish the given objective. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. The defendants have made an initial showing that the speech involved was misleading and that the government response was narrowly tailored to prevent such false advertising and was to protect the public.[47]

### A. Claim of Punishment for Advertising Services

■ The plaintiffs claim that the defendants have "punished" them in some way for advertising their business. The government defendants argue that the only action taken against the plaintiffs related to advertising was the investigation of complaints and the enforcement of the law. The government defendants claim that, in each instance in which the plaintiffs were subject to commission investigation and action related to advertising, the misrepresentative nature of the the content of the plaintiffs' advertisement was the focus of attention. The plaintiffs have in essence admitted this as to the brochure used by the plaintiffs.[48] In another advertisement, the plaintiffs compared their services to those of other brokers in Monroe County. A complaint was filed with the MREC, the MREC investigated the matter, and the MREC found that the advertisement did contain false and misleading information. The MREC's actions were directed toward the misrepresentations by a licensed real estate broker and did not improperly infringe the plaintiffs' rights to commercial speech.

The plaintiffs have failed to establish specific probative evidence sufficient to create a genuine issue of material fact on essential elements of this claim. The plaintiffs have not established facts to indicate either retaliation or "punishment" by MREC or that their speech would be protected by the First Amendment as truthful advertising. The defendants are entitled to judgment as a matter of law.

### B. Claim Concerning Advertising and Encouraging Attendance at Real Estate Schools

■ The plaintiffs claim that the MREC has punished the plaintiffs for encouraging persons to attend real estate schools and for advertising the programs at such schools. The plaintiffs admitted in a letter to the defendants that an error was made in the publication at issue.[49] The defendants argue that the letter of reprimand

---

**47.** The government defendants also have immunity defenses. *See* II.D.2. footnote.

**48.** The plaintiffs stated that 95% of the information was true, therefore 5% must have been false. *See* affidavit of James Pope at 9.

**49.** *See,* Government defendant's exhibit 3, letter from John E. Johnson dated May 15, 1981.

addressed misrepresentations in the advertisement and did not violate the First Amendment. The plaintiffs have not produced sufficient evidence to create a factual issue and have failed to establish that a First Amendment violation occurred as to the advertisements concerning real estate courses. The defendants are entitled to judgment as a matter of law.

### C. Claim Concerning the Use of Gifts in Advertising

 The plaintiffs' third and fourth claims of Count II involved the use of vacuum cleaners and tee shirts as part of advertising efforts. The plaintiffs advertised the fact that they gave vacuum cleaners to purchasers of real estate. Apparently, the plaintiffs also gave away "Century 21" tee shirts as a form of advertising. The government defendants argue that the complaint involving the vacuum cleaner did not primarily concern the advertisement of the vacuum cleaner but the fact that the vacuum cleaner given as a reward for the purchase of property did not work. The letter of reprimand also cautioned the plaintiffs about improper gifts and pointed out the pertinent statute, Miss.Code Ann. § 73–35–21(j) (1972). The MREC's investigation and letter of reprimand during the vacuum cleaner incident has not been shown to infringe the plaintiffs' right to free speech. The plaintiffs have not produced specific evidence to establish that the MREC took any action that inhibited truthful advertising.[50] The Popes did not advertise that they gave away faulty vacuum cleaners but they apparently did give a customer a defective vacuum cleaner as an inducement for the sale of real estate.

 The plaintiffs have not produced sufficient evidence to establish that the MREC has prohibited or discouraged the use of tee shirts in advertising. This claim would raise a legitimate First Amendment issue if the plaintiffs could set forth evidence to substantiate this claim. However, the plaintiffs have failed to meet the summary judgment standard.

The plaintiffs have failed to produce sufficient evidence to create genuine issues of material fact on the use of gifts in advertising claim. The defendants are entitled to judgment as a matter of law.

### D. Plaintiffs' Use of the Term "Realtor" as Claim

 The plaintiffs claim that the government defendants have prohibited them from using the term "realtor" in violation of the First Amendment.[51] The government defendants claim that they have not taken any action to prohibit or discourage the plaintiffs' use of the term realtor. The plaintiffs have not come forward with any specific evidence showing that the government defendants took steps to prohibit such speech by the plaintiffs in violation of the First Amendment. Even if the MREC had taken such action, the enforcement of trademark rights would not be a violation of the First Amendment. *See San Francisco v. U.S.O.C.,* —— U.S. at ——, 107 S.Ct. at 2971, 97 L.Ed.2d at 427.

The plaintiffs have not produced sufficient evidence to create a genuine issue of material fact in order to preclude summary judgment. The government defendants are entitled to judgment as a matter of law.

### IV.

### Due Process Claims Against the Government Defendants

Plaintiffs claim that the MREC, Harwick, and government investigators have violated the plaintiffs' due process rights in several respects.[52]

### A. Procedural Due Process Claim

 Plaintiffs' first claim of Count III is that the government defendants violated

---

**50.** The plaintiffs concede that they have no information of formal action taken by the MREC to enforce ethical guidelines of the NAR. *See* pretrial order at 8.EE.

**51.** Realtor is a federally registered trademark which the private defendants have sought to protect. *See* discussion above at II.E. generally.

**52.** The government defendants have immunity defenses. *See* II.D.2. footnote.

procedural due process by denying plaintiffs the right to a fair and impartial due process hearing. Specifically, they allege that plaintiffs were "found guilty" of charges without notice, that the decision relied in part on the existence of prior complaints, and that the MREC relied upon personal knowledge in reaching its decision.[53]

Hearings are not automatically provided in every instance where letters of reprimand or "caution" are issued.[54] The defendants do not dispute the fact that the plaintiffs were not given full due process hearings before private letters of reprimand were sent. The defendants do challenge, however, the plaintiffs' contention that they were not given notice of charges against them. The defendants claim that the plaintiffs received notice of each complaint and an opportunity to respond to the substance of the complaint before any reprimand was ever given and argue that this satisfies due process. The plaintiffs have stated they were not given a hearing or notice of a hearing but they have not created a genuine issue of fact as to whether or not the plaintiffs were given notice and the opportunity to respond to the complaints which led to the letters of reprimand.[55] The defendants concede that a full-blown hearing was not held on these complaints but they claim that the plaintiffs were given notice and the opportunity to respond to the complaints.[56]

The commission has acknowledged that the MREC must afford constitutional protections and show care and concern for the ability of a person to pursue a livelihood before it jeopardizes the license of a real estate broker. *In re Ruffalo*, 390 U.S. 544, 550, 88 S.Ct. 1222, 1225, 20 L.Ed.2d 117, 122 (1968); *Mississippi Real Estate Commission v. Ryan*, 248 So.2d 790, 793 (Miss. 1971).

Due process is a flexible standard which has been refined for different situations. *Schweiker v. McClure*, 456 U.S. 188, 200, 102 S.Ct. 1665, 1672, 72 L.Ed.2d 1, 11 (1982). In some contexts, due process procedural protection requires that the accused receive notice prior to termination of a property right, that written notice of the reasons for the suspension be given, and that an effective opportunity to rebut those reasons be provided. *See Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir.1970). In other contexts, due process protections are satisfied by a post-deprivation hearing which provides an opportunity for the accused to correct any errors in the accusations. In other contexts, due process protections require a full-blown hearing with notice prior to any governmental action.

The court applies a four-part test to determine whether the government defendants provided adequate due process safeguards in the context of informal letters of reprimand. *Matthews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976).[57] The court holds that due process is satisfied in this context when the accused is given notice, a copy of the complaint, and the opportunity to respond. The plaintiffs have failed to set forth suffi-

---

**53.** The plaintiffs also allege that prohibiting plaintiffs from providing "gifts" to customers violated substantive due process. However, the plaintiffs have not presented specific evidence sufficient to establish that the government defendants prohibited such activity by the plaintiffs. The defendants did inform the plaintiffs of the state statutes involved but did not take steps toward enforcement. The court therefore does not need to decide whether or not such a prohibition would violate substantive due process requirements in addition to First Amendment requirements. See discussion at III.C. above. However, the court notes that prohibiting gifts between a merchant and his own customer is different from prohibiting "gifts" from a seller's *agent* to a purchaser to induce a real estate sale. *See* Miss.Code Ann. § 73–35–21(j) (1972).

**54.** *See* depositions of Phillip Hardwick at 20 and Kenneth Ammons at 12–13.

**55.** *See* affidavit of James Pope at 7.

**56.** *See* deposition of Kenneth Ammons at 12–13 and Phillips Hardwick at 20, 24–26.

**57.** The court considers the private interest affected by the official action, the risk of erroneous deprivation of such interest by the procedures used, the probable value of additional safeguards, and the government's interest. *Matthews*, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed. 2d at 33.

cient evidence to establish that the defendants failed to give notice of the complaint, a copy of the complaint, and a reasonable opportunity to respond.[58]

The plaintiffs have not produced sufficient evidence to establish that the MREC officials relied on personal knowledge or prior complaints in their decision and have not shown the court precisely how such problems would violate due process requirements and how such claims would avoid Eleventh Amendment immunity and qualified immunity for these defendants. The plaintiffs did not use their opportunity to appeal these decisions by the government defendants. The plaintiffs have not met the summary judgment standard, so the court finds for the defendants on this issue as a matter of law.

### B. MREC's Dual Role as Prosecutor and Judge as Due Process Claim

The plaintiffs' second claim of Count III is that the MREC's role as both prosecutor and judge violates due process because it fails to insure fair and impartial hearings. The plaintiffs also allege that the MREC relied upon information which is not available to the plaintiffs and communicated with its investigative and administrative officers outside the presence of the plaintiffs.

The defendants have not disputed that the MREC has both investigatory and judicial functions and that it acted in both roles toward the plaintiffs. However, the combination of investigative and judicial functions within an agency does not in itself violate due process. *Gibson v. FTC*, 682 F.2d 554, 560 (5th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1521, 75 L.Ed.2d 945 (1983). In the case *sub judice*, the plaintiffs have not made a showing of specific facts to indicate the existence of bias or prejudice from these dual roles. Due process demands impartiality on the part of those who act in a judicial role. However, the decision maker is presumed

unbiased unless proven otherwise. *Schweiker*, 456 U.S. at 195, 102 S.Ct. at 1670, 72 L.Ed.2d at 8.

In *Withrow v. Larkin*, 421 U.S. 35, 58, 95 S.Ct. 1456, 1470, 43 L.Ed.2d 712, 730 (1975), the Supreme Court failed to find a due process violation where a medical examining board served as both the investigative and adjudicative body when it warned and reprimanded a physician, temporarily suspended his license and instituted criminal license revocation proceedings. In the case *sub judice*, the defendants' undisputed claim is that the investigation is done by the staff, that a commissioner from outside the congressional district of the accused reviews the staff recommendation to determine whether or not the complaint should be carried forward, and that the hearings by the MREC are conducted by members of the commission who did not participate in the investigation.

The plaintiffs have not produced specific evidence to establish the existence of bias or prejudice or the denial of a fair and impartial due process hearing because of the dual functions of the MREC. Likewise, the defendants have failed to set forth specific evidence sufficient to establish that the plaintiffs were denied access to MREC information or that ex parte communications between MREC officials occurred, or shown that this action would have violated the plaintiffs' due process rights by denying a fair and impartial hearing.

The plaintiffs have not produced sufficient evidence to create a genuine issue of material fact. The government defendants are entitled to judgment as a matter of law on this due process claim.

### C. Claim of Deprivation of Liberty Without Due Process by the Publication of Information Damaging Plaintiffs' Reputation

The plaintiffs allege that they have been denied liberty without due process

---

**58.** The plaintiffs had a right to request a hearing and had an opportunity to appeal any adverse decision of the MREC to a circuit court. Miss. Code Ann. § 73–35–25(1) (1972). Even if the notice and opportunity to respond were insuffi-

cient and the letter of reprimand could be said to violate due process, the plaintiffs had an adequate post-deprivation opportunity to assert their due process rights.

because the statements of the government defendants harmed the plaintiffs' reputation when they were "published" by a local newspaper.[59]

Persons may sometimes possess a liberty interest in their reputation. *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548, 558 (1972). However, not every act of a public official resulting in defamation creates a deprivation of liberty under the Fourteenth Amendment. *Paul v. Davis,* 424 U.S. 693, 702, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405, 414 (1976).

The Supreme Court has refused to recognize a liberty interest in one's reputation apart from some more tangible interest and official removal of that interest. *Paul v. Davis,* 424 U.S. at 701, 711, 96 S.Ct. at 1160, 1165, 47 L.Ed.2d at 414, 420.

Rather his interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where as here inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" recognized by a state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws. For these reasons we hold that the interest in reputation asserted in this case is neither "liberty" nor "property" guaranteed against state deprivation without due process of law.

*Paul v. Davis,* 424 U.S. at 712, 96 S.Ct. at 1165–66, 47 L.Ed.2d at 420. The plaintiffs

do not have a constitutionally protected liberty interest in their reputation in the case *sub judice.*[60]

The plaintiffs have failed to produce evidence to create a genuine issue of material fact on this challenge to the due process claim. The defendants are entitled to judgment as a matter of law or the injury to reputation claim.

V.

### Claim of Equal Protection Violation From Arbitrary Enforcement

■ Count IV of the plaintiffs' amended complaint claims that the government defendants have enforced the law in an arbitrary manner. The only incident pointed out by the plaintiffs involves information concerning Joyce Murphy developed before the Board of Realtors.[61] The plaintiffs have produced no evidence to indicate that the commission has failed to act upon complaints actually filed with the MREC.[62]

The Supreme Court has held in an unlawful administration context that a denial of equal protection has not occurred unless there is an element of intentional or purposeful discrimination by government officials. *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497, 503 (1944).[63]

The plaintiffs have not produced sufficient evidence to establish discrimination in the enforcement of the law by the defendants, either purposeful or otherwise. The plaintiffs were the object of a relatively large number of complaints, but each of these complaints, except one, began with complainants making sworn statements

59. The statements attributed to Hardwick are privileged if they occurred in a judicial context. *See Netterville v. Lear Siegler, Inc.,* 397 So.2d 1109, 1113 (Miss.1981).

60. The plaintiffs have also failed to set forth specific evidence to establish that the government's own actions injured the plaintiffs' reputations and have not shown any denial of due process. The government defendants would not have violated any possible liberty interest by holding a public hearing on a complaint. The government defendants apparently did not "publish" the disputed information or initiate its publication.

61. *See* deposition of James Pope at 292.

62. The government defendants also have immunity defenses. *See* II.D.2. footnote.

63. The situation in *Snowden* involved the unlawful administration of a state statute by state officials that resulted in the unequal application of a facially fair statute. Similarly situated persons may be treated differently in the application of the law without violating the equal protection clause.

and filing complaints with the commission. The MREC operates under a statutory mandate to receive and investigate all complaints. Although the plaintiffs claim that there were violations by other licensees, the plaintiffs admitted that they did not file any complaints with the commission regarding such violations. The plaintiffs are now in the awkward position of alleging selective enforcement when they themselves failed to take advantage of the mechanism provided for MREC prosecution of license violations. The court notes that the MREC took enforcement action based upon many of the complaints filed against the plaintiffs. The plaintiffs have not produced sufficient evidence to establish that the defendants were unfairly targeting the plaintiffs for enforcement actions or that the defendants were overlooking violations by other licensees.

The plaintiffs have failed to produce evidence sufficient to create a genuine issue of fact to preclude summary judgment on the equal protection claim. The defendants are entitled to judgment as a matter of law.

## VI.

### Claim that First Amendment Rights Violated by Retaliation For Prior Litigation

█ In Count IX, the plaintiffs claim that the government defendants have violated the plaintiffs' first amendment rights by retaliating against them for bringing an earlier antitrust action against the MREC in Hinds County, Mississippi. The defendants argue that the plaintiffs were not part of the prior law suit and had no connection to the law suit other than their general affiliation with Century 21. The prior litigation in Hinds County involved commission regulations prescribing the size of lettering on advertising signs. The plaintiffs did not respond to the defendants' challenge to Count IX.

The plaintiffs have not established specific acts of retaliation which might relate in any way to the apparently unconnected law suit. The plaintiffs have not set forth

specific evidence sufficient to create a genuine issue of material fact regarding retaliatory conduct and this antitrust claim. The court finds that the defendants are entitled to judgment as a matter of law on Count IX.

## VII.

### Pendent State Law Claims

█ The plaintiffs have made numerous pendent state law claims against the various defendants. These include the state antitrust allegations in Count I, interference with economic relations, business relations, and business contracts in Count V, libel, slander, and defamation in Count VI, the violation of the public record statute in Count VII, and the violation of separation of powers in Count VIII.[64] Having dismissed the federal claims, the court finds it appropriate to also dismiss these state law claims so that these pendent claims may be brought in the most appropriate forum.

The courts have long recognized that a judge has wide discretion to dismiss a pendent state claim after the dismissal of federal claims. In exercising this discretion, the district court should look to "considerations of judicial economy, convenience and fairness to litigants" and should avoid needless decisions of state law. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966). "It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228. *Gibbs* has been followed consistently by the Supreme Court. *See Carnegie–Mellon Univ. v. Cohill*, —— U.S. ——, ——, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988). The *Gibbs* doctrine "is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values." *Carnegie–Mellon*, at ——, 108 S.Ct. at 619.

---

**64.** The court notes that the plaintiffs have produced little evidence to support these challenged claims.

"In the absence of a federal claim, a district court may in its discretion, and generally should, dismiss pendent state law claims." *Slaughter v. Allstate, Inc.*, 803 F.2d 857, 859 (5th Cir.1986). The court does not find that considerations of judicial economy, convenience, and fairness to the litigants requires the exercise of pendent jurisdiction on these state law claims. Although this action has been pending for quite some time, the heart of the case is the federal antitrust and constitutional claims which are being dismissed. The part remaining would form a practically new case. The plaintiffs' pendent state claims will be dismissed without prejudice. *Pharo v. Smith*, 621 F.2d 656, 674 (5th Cir.1980).

### VIII.

#### Summary of Legal Conclusions

The case *sub judice* presents antitrust, constitutional, and pendent state claims in a summary judgment posture. Once the defendants have properly challenged the plaintiffs' claims, the plaintiffs must produce sufficient evidence to establish a genuine issue of material fact in order to preclude summary judgment. If the plaintiffs have not established an essential element of their claim, or have not adequately defended against the defendants' attacks on their claim, the court should determine that the defendants are entitled to judgment as a matter of law.

The plaintiffs' antitrust claims fail because of the failure to establish an effect on inter-state commerce, the market power of the realty organization, the antitrust injury necessary for standing, or the essential elements of their specific antitrust claims. The plaintiffs failed to establish the essential elements of their First Amendment claims, failed to create genuine issues of material fact, and failed to dispute the defendants' challenges to their claims. The plaintiffs failed to establish sufficient evidence to support and defend their due process claims and equal protection claim, as well. Additionally, the government defendants established immunity defenses. Given the failure to estab-

lish their antitrust and constitutional claims, the court will dismiss the pendent state law claims for the sake of comity, judicial economy, and fairness to the litigants.

The plaintiffs failed to advance any genuine issue in the case *sub judice.* Instead, the plaintiffs have used the shotgun approach to litigation and thereafter created a great deal of smoke, but no fire. The court painstakingly examined each claim and found them all wanting. The case should be dismissed at this juncture to avoid the further waste of judicial resources.

An order in accordance with this opinion will this day be issued.