AMERICAN MANAGEMENT CORPORA-
TION, d/b/a American Insurance
Group and American Management In-
surance Group, Plaintiffs,

v.

Samuel DUNLAP, d/b/a Sam Dunlap In-
surance Agency and Robinson Insur-
ance Agency, South Central Insurance
Agency, Inc., Robinson Insurance
Agency, Inc. and Various John Does,
Defendants.

Civ. A. No. EC 90–67–D–D.

United States District Court,
N.D. Mississippi, E.D.

Jan. 24, 1992.

John C. Henegan, Donna Brown Jacobs, Jackson, Miss., William C. Brazil, Conway, Ark., for plaintiffs.

J. Niles McNeel, Richard P. Ballard, Louisville, Miss., for defendants.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This matter is currently before the court on the motion of defendant Samuel Dunlap, d/b/a Sam Dunlap Insurance Agency ("Dunlap"), for summary judgment against plaintiff. In opposing the motion, plaintiff (American Management Corporation, d/b/a American Insurance Group and American Management Insurance Group ("AMIG")), has cross moved for partial summary judgment on the issue of defendant Dunlap's individual liability on account of his personal guaranty. Based upon a thorough review of the parties' briefs, pleadings, affidavits, depositions, interrogatories, authorities, the record as a whole and its own research, the court now issues its opinion: The motion of defendant for summary judgment is hereby denied; plaintiff's cross motion for partial summary judgment on Dunlap's individual guaranty is hereby granted.

## FACTUAL SUMMARY

This action consists of six counts and concerns several agency agreements between defendant Dunlap and plaintiff AMIG, some of which contain a guaranty signed by defendant Sam Dunlap. The first agreement between the parties arose out of their association with the Orion Group, Incorporated. Approximately in 1984, AMIG became a general managing agent of the Orion Group, according to the affidavit of AMIG's Chairman, Stephen L. Strange. Dunlap was a local agent for the Orion Group and wrote service station insurance coverage for it through Brentwood Insurance Brokers, Orion's California managing general agent. AMIG purchased this service station book of business and became responsible for marketing the service station policies which Brentwood issued.

About the same time, defendant Dunlap entered into a limited agency agreement with AMIG for the marketing of insurance products offered by the Orion Group. Under this agreement (as explained in the amended complaint), Dunlap was autho-

rized to act as agent for certain insurance companies which had previously appointed AMIG as their general agent, such as Orion. Dunlap was further authorized to solicit, receive and transmit proposals for insurance to the companies through AMIG and was to remit all premiums to AMIG. As compensation, the agreement called for Dunlap to receive a commission.

AMIG entered another agency agreement with Dunlap as president of South Central Insurance Agency, Inc. ("SCIAC"); as its president, Dunlap owned one hundred percent (100%) of the Mississippi corporation's shares of stock. *See* Dunlap Deposition, June 10, 1991, p. 66. Pursuant to this agency agreement, SCIAC was authorized to market insurance product lines offered by AMIG in Mississippi, Alabama, Georgia, Louisiana, North Carolina, and South Carolina. An individual guaranty was included in the SCIAC/AMIG agency agreement on the final page of the contract; it was to be executed by Sam Dunlap as SCIAC's principal.[1]

According to his deposition testimony, Dunlap, in July, 1988, formed another corporation, South Central Insurance Agency of Georgia, Inc. ("SCIAC–GA") to market insurance products in Georgia. As he had done with SCIAC, Dunlap, through SCIAC–GA, entered into another agency agreement with AMIG for marketing Orion insurance products. Dunlap signed both agency agreements as president of the respective companies. As he had done in the previous AMIG agency agreement, Dunlap executed an individual guaranty with the 1988 agency agreement, with respect to unaccounted premiums.

In his deposition testimony, Dunlap explains that in accordance with the agreements, employees of SCIAC and SCIAC–GA accepted applications for insurance coverage and submitted the applications to AMIG.[2] AMIG was the underwriter and the policies were then issued by the various insurers. Under the express terms of the agreements, SCIAC and SCIAC–GA, after retaining their commissions from the collected premiums, held the remaining amounts in trust for AMIG.[3]

AMIG's problems in collecting premiums owed by SCIAC and SCIAC–GA began approximately in 1988, according to the affidavit of AMIG's Treasurer, Alice Reidmueller. She explains that Dunlap's agencies were not remitting payment on all policies, would remit only partial payment or sometimes remit no payments for his monthly accounting statements.

Attempts by AMIG, over a two year period, to resolve these collection problems failed and on March 19, 1990, AMIG terminated SCIAC as a producing agent. AMIG later audited Dunlap's policy files and records, as permitted by the agency agreements and a consent decree entered in this cause on April 12, 1990, to verify policy charges. AMIG represents to the court that the audit performed by AMIG's treasurer supports its figures.

---

1. The guaranty provision provided: "To be executed in case of incorporated agencies, making individuals interested liable for premiums not accounted for by the Corporation: in Consideration of the Company appointing the above named Agent, and as an inducement to it to do so, *South Central Insurance Agency, Inc.* hereby guarantees the faithful performance of the obligations mentioned by such Agent and firmly bind *South Central Insurance Agency, Inc.* to pay any sum for which said Agent may become liable to pay to the Company by virtue of the agency created under the foregoing agreement and which said Agent shall fail or refuse to pay."
Title *signature of Sam Dunlap* Witness *signature of Pam Womack*
 Sam Dunlap

2. On page 60 of his deposition testimony, exh. 7, Dunlap stated that, "[W]e would ... take applications, process the applications, and we'd send them into the company."

3. Section "3)a." of the March 3, 1986 Agency Agreement states that, "The Agent agrees that all premiums received by the Agent shall be held by him as Trustee for the Company until delivered to it." Page 61 of Sam Dunlap's deposition reads: "Q. And then your agency would take its commission out of that payment and was required under the agency agreement to remit the balance to AMIG; is that correct? A. That's in theory the way it was supposed to work. Q. And you had the right to do that under this agency agreement; is that right? A. That's right."

On March 28, 1990, AMIG instituted an action to recover the sums owed by SCIAC and Sam Dunlap, including attorneys fees and expenses, alleging breach of contract and breach of fiduciary duty. On June 13, 1991, AMIG amended its complaint to include an action for reformation of the guaranty dated on or about March 3, 1986, and to recover from Sam Dunlap on that guaranty. A second amended complaint was filed on July 17, 1991. Plaintiff also seeks $500,000 in punitive damages.

At issue is approximately $150,000 in insurance premiums which AMIG claims Dunlap never remitted; AMIG claims it is owed $114,147.24 for unpaid premiums and unauthorized credits on business placed with Orion and $17,453.80 for unpaid premiums and unauthorized credits on business placed with Great American Insurance Company. In addition, AMIG states that it incurred expenses of $8,898.44, resulting from the Dunlap audit.

## CONCLUSIONS OF LAW

Defendant Sam Dunlap contends that there is no evidence indicating any involvement of Sam Dunlap, d/b/a Sam Dunlap Insurance Agency, with the litigation at hand; it is on this premise that he moves this court for summary judgment. The court finds that the motion is not well taken.[4] Sufficient evidence exists to create several jury questions on the issue of Sam Dunlap's personal liability to AMIG[5]. One such issue is whether to disregard the corporate form of SCIAC and attach liability to Dunlap, its sole shareholder and president, for corporate debt and obligations.

A corporation is a legal entity that exists separate and apart from its shareholders, officers, and directors. As a general rule, the aforementioned individuals are spared liability for the corporation's debts and obligations because of the corporate fiction. *FMC Finance Corp. v. Albert D. Murphree, Jr.*, 632 F.2d 413, 421 (5th Cir.1980). However, courts will "pierce the corporate veil" contrary to the established principle of limited corporate liability, under special circumstances. *Id.* For instance, neighboring states have applied the concept of piercing the corporate veil to remedy injustices, which arise when a party "has overextended his privilege in the use of a corporate entity in order to defeat justice ... or evade a contractual or tort responsibility." *Randall v. Timberlake Associates, Inc.*, 199 Ga.App. 574, 405 S.E.2d 564 (1991).

In *Randall*, the Georgia Court of Appeals reversed summary judgment on the issue of corporate disregard. Although it was plaintiff who sought to have summary judgment upheld in *Randall*, the court finds that the case still has bearing here in *Dunlap*, where the defendant is moving for summary judgment. Whether it is a defendant who seeks to preserve a corporate shield over him, or a plaintiff who is attempting to pierce the corporate veil, corporate disregard often raises genuine issues of material fact, thus making summary judgment inappropriate. In other words, the court is of the opinion that

**4.** Defendant has provided the court with very little in the way of support for the motion for summary judgment in its favor. Dunlap merely relies on plaintiff's answers to two of defendant's interrogatories: (1) The response to Interrogatory No. 6 of the first set of interrogatories propounded to plaintiff; and (2) The response to Interrogatory No. 1 from the second set of interrogatories. The response to No. 6 lists both SCIAC and Sam Dunlap as owing plaintiff $119,002.28. Dunlap fails to inform the court why he believes plaintiff's answer supports his summary judgment motion; the court can only infer that Dunlap takes issue with extending SCIAC's liability to him.

His reliance on plaintiff's response to No. 1 is equally unpersuasive. Defendant inaccurately asserts that plaintiff had no response to a request for evidence supporting liability of Dunlap. Plaintiff had merely not yet responded to this interrogatory at the time of defendant's motion for summary judgment, May, 1991. In the following month, June, 1991, plaintiff provided defendant with a response to this interrogatory.

The court fails to see how either of these responses in any way serves as a basis for an award of summary judgment in Dunlap's favor.

**5.** The court reserves discussion of whether factual issues exist concerning Dunlap's intent to be personally bound to AMIG by virtue of his signing a personal guaranty for later in the opinion when it addresses plaintiff's cross motion for partial summary judgment.

reasonable jurors could find from the evidence presented that no true distinction exists between Dunlap and either of the various corporate entities he formed; therefore, the corporate veil should be pierced. Where appropriate to further the ends of justice, a corporation and individual who owns all of its stock and assets will be treated identical. *TCL, Inc. v. LaCoste*, 431 So.2d 918, 922 (Miss.1983).

In *Thames & Company v. Eicher*, 373 So.2d 1033 (Miss.Sup.Ct.1979) the court held that the sole shareholder of a corporation was personally liable in an action for breach of warranty and damages concerning purchase of a new home. *TCL, Inc.*, 431 So.2d at 922. In that case, the proof showed that the corporation was no more than the alter ego of Mrs. Rogers who held all of the stock in the company and could not recall who the directors or officers or other stockholders of the corporation were. *Id.*

Some of the elements found in *Thames* are present in the case *sub judice*. For instance, Dunlap's testimony reveals that Dunlap was the 100 percent shareholder of SCIAC. Like Rogers in *Thames*, Dunlap could not recall who other officers of the corporation were. These and other factors make the question of whether defendant Dunlap is open to personal liability via corporate disregard one for the jury.[6] Just as the court in *Randall* declined to affirm summary judgment and expose appellant Randall to personal liability on the basis of corporate disregard, this court declines to award summary judgment to defendant Dunlap that would absolve him of personal liability.

 Apart from the issue of corporate entity disregard, there is sufficient evidence to create a separate jury question on the issue of Dunlap's personal liability as a corporate officer. *Kitchens v. Miss. Ins. Guar. Ass'n*, 560 So.2d 129, 134 (Miss. 1989), *reh'g denied*, April 25, 1990, *followed*, *Rowley v. First Columbia Life Insurance Co.*, 741 F.Supp. 1259, 1261 (S.D.Miss.1989). An individual corporate officer generally may be held liable jointly with a corporation for a tort he commits as an agent of the corporation. It is the opinion of the court that reasonable jurors could find that Dunlap either participated in or authorized the commission of a tort, thereby triggering personal liability in him, individually, as a corporate officer. *See Mississippi Printing v. Maris, West & Baker*, 492 So.2d 977 (Miss.1986) (when corporate officer directly participates in or authorizes commission of a tort, even on corporation's behalf, he may be held personally liable). This is the general rule which Mississippi follows. *See Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168 (5th Cir. 1985). *First Mobile Home Corp. v. Little*, 298 So.2d 676, 679 (Miss.1974); *Grapico Bottling Co. v. Ennis*, 140 Miss. 502, 106 So. 97, 98 (1925); *Childers v. Beaver Dam Plantation*, 360 F.Supp. 331 (N.D.Miss. 1973). Thus, there is a question whether Dunlap is personally liable to AMIG as a corporate officer for tortious conduct.

 In his reply brief, Dunlap asserts that the suit is "strictly a suit founded in contract" and involves no tort. The court agrees that actions for breach of contract, when styled as a tort, still require proof of a breach of contract. *Schoonover v. West American Ins. Co.*, 665 F.Supp. 511, 516 (S.D.Miss.1987). This principle, however, does not foreclose the possibility that the breach of contract came about because of tortious conduct. While a wrongful breach of contract may not be a tort in the general sense, *see Griffin v. Ware*, 457 So.2d 936, 938 (Miss.1984)[7], the general rule in tort

---

6. In *FMC Finance Corp.*, 632 F.2d at 421, the fifth circuit reversed the district court and held that the issue of corporate entity disregard is one for the jury. *See DelChamps, Inc. v. Borkin*, 429 F.2d 417 (5th Cir.1970) (corporate disregard question in contract case properly submitted to jury); *Continental Casualty Co. v. United States*, 308 F.2d 846 (5th Cir.1962) (proper to submit to jury question whether corporation was sham and subterfuge).

7. Apparently on different grounds, *Griffin* has been overruled. *Alfa Insurance Corp. v. Word of Faith Ministries*, 139 F.R.D. 350 (S.D.Miss. 1991) states that *Bass v. California Life Insurance Co.*, 581 So.2d 1087 (Miss.1991) overruled *Griffin* on the issue of whether an adjuster can be liable to the insured; *Griffin* had held that no

concerning liability of corporate officers is still relevant and applicable where a corporation cannot meet its contractual obligations, as appears to be the case here with *Dunlap. Schoonover v. West American Ins. Co.*, 665 F.Supp. 511 (S.D.Miss.1987).

■ If there was tortious conduct, then Dunlap was not insulated from the liability merely because he was a corporate officer. It has been held in this jurisdiction, as well as others, that any officer of a corporation who actively participates in the commission of a [conversion] is personally liable to third persons injured thereby. *Wilson v. South Central Mississippi Farmers*, 494 So.2d 358, 361 (Miss.1986). The applicable rule is also found in 19 C.J.S. Corporations § 849, p. 276:

> The rule that directors, officers, or agents, of a corporation are liable for their torts to a person injured thereby, ... is applicable where they are guilty of conversion. This is true even though they act in behalf of the corporation and although the corporation may also be liable, *as where money or property of a third person is in the hands of the corporation and the officers in control knowingly and intentionally converted by refusing to give up possession,* or by applying it to the uses of the corporation; and it is also true even though the directors, officers, or agents act in good faith, and do not personally benefit or profit from the conversion. All who are concerned or participate in the wrong are personally liable (emphasis added).

■ When considering a motion for summary judgment, it is the established rule that the court must look to the evidence in the light most favorable to the party opposing summary judgment. *Wilson*, 494 So.2d at 361. Looking at the evidence adduced in this case, especially the deposition testimony of defendant Sam Dunlap, the court is of the opinion that defendant Dunlap actively participated in the withholding of insurance premiums due AMIG. Thus, the evidence is sufficient to establish a jury question as to whether personal liability existed in Sam Dunlap for nonremittitur of insurance premiums to AMIG.[8]

The above discussion of defendant Dunlap's liability finally leads the court to consider next whether the signed personal guaranty in each of the agency agreements creates a jury question on the personal liability of Dunlap. As mentioned earlier, plaintiff has cross moved for partial summary judgment on the claim that personal liability lies with Dunlap by virtue of his signing the personal guaranty in the agency agreements; on this issue, the court awards partial summary judgment to plaintiff AMIG.

It is the opinion of the court that the language of the personal guaranty on the last page of the agency agreement manifests a clear intent to bind its signer personally. Since there was nothing in the personal guaranty manifesting an intent not to bind Dunlap, individually, and the guaranty was worded so to bind him personally, the court concludes that there are no genuine issues of material fact and plaintiff is entitled to judgment as a matter of law; therefore, summary judgment is appropriately issued. *See Ricker v. B.W. Acceptance Corporation*, 349 F.2d 892, 896 (10th Cir.1965).

■ As an experienced businessman, Dunlap is expected to have read the agency agreement and personal guaranty that gives rise to his personal liability. *F.M.C. Finance Corp.*, 632 F.2d at 419. The record reflects that Dunlap knew he was signing a personal guaranty of the insurance premiums in the event of non-remittitur by SCIAC. Even if he had not read the instrument, he would not be absolved

---

liability attached to an adjuster; *Bass* makes insurance adjusters liable to an insured for gross negligence, malice, or reckless disregard for the rights of the insured. *Bass*, 581 So.2d at 1090.

**8.** Dunlap admitted in this deposition testimony that he would have directed his accounting de-

partment to remit to AMIG any premiums that SCIAC owed AMIG. It is the opinion of the court that a jury issue exists as to whether Dunlap's non-remittitur of insurance premiums to AMIG amounts to tortious conduct on his behalf, thus making him personally liable.

of personal liability. *See C.G. Ivy v. Grenada Bank*, 401 So.2d 1302, 1303 (Miss. Sup.Ct.1981).

Because "Title" precedes the signature line where his signature appears, Dunlap argues that he signed the personal guaranty in his official capacity.[9] It is his position that because he only intended to sign as a corporate officer of SCIAC, he cannot be held personally or individually liable for the corporate obligations and debts of SCIAC. The court finds no merit to this contention. All this amounts to, in the opinion of the court, is a vague and general assertion. Dunlap's claim that he never intended for it to be a personal obligation is insufficient to create any issue of material fact. *See Sebastian International, Inc. v. Peck*, 195 Cal.App.3d 803, 240 Cal.Rptr. 911 (Cal.App. 2 Dist.1987) (signator's mere addition of a title following the signature on a document otherwise purporting to be a personal guaranty does not change its personal character);[10] *Smith v. Haywood Oil Company, Inc.*, 199 Ga.App. 562, 405 S.E.2d 560 (1991) (appellant was obligating himself personally on the obligation, notwithstanding his testimony to the contrary); *Volume Tire v. O'Connor*, 190 Ga.App. 242, 378 S.E.2d 415 (1989); *Evans v. Smithdeal*, 143 Ga.App. 287, 238 S.E.2d 278 (1977).

When a motion for partial summary judgment is made and supported, the adverse party may not rest upon mere allegations or denials; denials or allegations by the non-moving party in the form of legal conclusions that are unsupported by specific facts have no probative value. Although the court does not assess the probative value of the material presented, *Jones v. Western Geophysical Company of America*, 669 F.2d 280, 283 (5th Cir.1982), evidence offered in opposition to a motion for partial summary judgment that is clearly without probative force is insufficient to create a genuine issue. *Pope v. Mississippi Real Estate Commission*, 695 F.Supp. 253, 262, aff'd, 872 F.2d 127 (5th Cir.1989) (N.D.Miss.1988)). To preclude summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Broadway v. Montgomery*, 530 F.2d 657, 660 (5th Cir. 1976); *see also Benton—Volvo—Metairie, Inc. v. Volvo Southwest, Inc.*, 479 F.2d 135, 139 (5th Cir.1973).

In light of the above, the court finds that Dunlap has not met his burden; therefore, plaintiff is entitled to partial summary judgment against him on the issue of his individual liability arising out of the personal guaranty he signed.

In considering this issue, the court was compelled to consult case law of foreign jurisdictions where this issue has arisen more frequently. Among the cases the court considered is *Ricker*, 349 F.2d 892. The issue before the United States Court of Appeals for the Tenth Circuit in *Ricker* is strikingly similar to the issue presently before this court in addressing plaintiff's cross motion for summary judgment. In the *Ricker* case, the trial court granted summary judgment against defendant Ricker, who had signed a personal guaranty as president of the corporation and defendant appealed. In affirming the trial court grant of summary judgment, the tenth circuit ruled that the appellant's position that he did not intend to obligate himself personally raised no material issue of fact, because the written guaranty agreement was not ambiguous. *Ed Beef Industries, Inc. v. Schuyler*, 239 Kan. 38, 716 P.2d 544 (1986). The court held that to

---

**9.** Defendant states in his reply brief and deposition (see Dunlap deposition, page 55) that it was not his intent to be bound personally; he signed the guaranty purely as a corporate officer.

**10.** In this case, the defendant Peck was vice-president of West Valley Blanchard Grinding, Inc. Peck signed a personal guaranty of West Valley's obligations under a lease but added the notation "Vice-President" after his signature. In an action to enforce the guaranty, Peck contended that because he signed in his corporate capacity, the guaranty bound only the corporation. Rejecting this argument, the court referred to cases from several other jurisdictions for the proposition that titles and the like are generally terms " 'descriptive of the person rather than the relationship in which he signs the agreement.' " *Sebastian*, 195 Cal.App.3d at 808, 240 Cal.Rptr. 911, *quoting Klutts Resort Rlty. v. Down 'Round Development*, 268 S.C. 80, 232 S.E.2d 20, 24 (1977).

construe the personal guaranty as binding only the corporation and not Ricker, individually, would contradict and vary the language of the written instrument itself. *Ricker*, 349 F.2d at 896.

Following the reasoning of the court in *Ricker*, the court is of the opinion that the insertion of SCIAC (rather than Sam Dunlap) in the blank space provided for naming the guarantor did not change the legal effect of the document as being Dunlap's signed personal guaranty. Placing liability in the corporation rather than Dunlap, individually, would defeat the obvious purpose of the personal guaranty. *See Home Federal Savings and Loan Association v. Ramos*, 229 Cal.App.3d 1609, 284 Cal.Rptr. 1 (4th Dist.1991) (personal guaranty would not have been required of the corporation because the corporation was already liable without the guaranty). Indeed, it would have been nonsensical for the corporation to have guaranteed its own debt. *Smith*, 405 S.E.2d 560.

In the court's view, *Smith* is exemplary of situations that warrant summary judgment and deserves some discussion. Briefly, the plaintiff in *Smith* brought suit against a corporate president on a contract of guaranty of corporate debt. The guaranty was for indebtedness owed by the company, VianSa Industries, Inc. Summary judgment was granted and Smith appealed; he alleged that a material question of fact existed as to whether he signed the guaranty in his individual or his representative capacity. *Id.* The Court of Appeals affirmed summary judgment for plaintiff, holding that "the trial court properly concluded that the appellant's obligation as guarantor extended to the full amount of indebtedness." *Id.*

Following the logic of the Court of Appeals of Georgia, the court is of the opinion that it is clearly evident beyond dispute that Dunlap was obligating himself personally and assumed liability for remittance of insurance premiums to AMIG, despite his statements in deposition to the contrary. To interpret the guaranty as attaching no personal liability to Dunlap is objectively unreasonable; it would render the doc-

ument a nullity. *Home Fed. S. & L.*, 229 Cal.App.3d at 1614, 284 Cal.Rptr. at 4. The court will not permit a signatory to a personal guaranty to escape individual liability just by attaching a title to his signature. *Home Fed. S. & L.*, 229 Cal.App.3d at 1614, 284 Cal.Rptr. at 4.

Notwithstanding the above, there may be some instances when genuine issues of fact may exist concerning whether a corporation's president's guaranty was signed in an individual or official capacity. *See Hartkopf v. Heinrich*, 200 Ga.App. 355, 408 S.E.2d 450 (1991) (unclear whether Hartkopf acting individually or on behalf of HEI corporation or whether language at issue constituted words of personal guaranty). Here in the present case, however, there is no question in the court's mind that the document Dunlap signed was designed to serve as his personal guaranty to AMIG.

 The court also notes that in *Randall*, 405 S.E.2d 564 (a case discussed earlier in this opinion when the court addressed the issue of corporate disregard), the Georgia Court of Appeals declined to affirm summary judgment against appellant personally on a guaranty. On the personal guaranty issue, however, the facts of *Randall* are distinguishable from the instant case. In *Randall*, plaintiff was relying on a financial statement which Randall signed. A financial statement (UCC–Form 1) does not create a personal guaranty; it has no words of personal guaranty. *Id.* at 565. Furthermore, a financial statement is merely notice of a security interest; it does not create one; a security interest is created by a security agreement. *Id.* *See Kubota Tractor Corp. v. Citizens & Southern National Bank*, 198 Ga.App. 830, 403 S.E.2d 218 (1991). Unlike a UCC–Form–1 financial statement, defendant Dunlap's signed guaranty in the respective agency agreements is unquestionably a personal guaranty.

Having distinguished the circumstances outlined in the above cases from those present here, the court reiterates that the intent of the guaranty of Dunlap to AMIG

is clear. A contract of guaranty, like every other contract is made by the mutual assent of the parties. *Hauswald v. Katz*, 216 A.D. 92, 214 N.Y.S. 705 (1st Dept.1926). When the contract is signed by the guarantor at the other party's request, mutual assent is proved. *Id.* The evidence shows it was plaintiff AMIG's regular practice to require a personal guaranty by some person or entity, other than the incorporated agent, as part of every agency agreement with an incorporated agency. Apparently, the agency agreement with AMIG was contingent on AMIG's receiving a personal guaranty from Sam Dunlap for SCIAC's obligations. This is supported by the July, 1988 agency agreement containing a signed personal guaranty from Sam Dunlap. In that particular agreement, Dunlap personally guaranteed all sums owed by SCIAC, Inc. of Georgia, a newly incorporated agency with which AMIG was about to do business. The language of the 1988 personal guaranty is identical to the 1986 guaranty Dunlap signed.

It is this language, plus Dunlap's signatures, which the court views as decisive. Dunlap's current efforts to use the appearance of "Title" by his signature, or the inclusion or omission of qualifiers such as "individual" to cast doubt over the true intent of the parties fails. *See Beco, Inc. v. American Fidelity Fire Insurance., Co.*, 370 So.2d 1343 (Miss.1979) (even though performance bond issued in name of sole proprietorship and signed by Wolfe as individual, but electrical equipment in question was supplied to family corporation, supplier of same could recover against issuer of performance bond; "inescapable conclusion" that Bob J. Wolfe Sr. (only signature on bond) was real actor, whether as individual or by his family corporation).

For all of the above reasons, defendant's motion for summary judgment is denied; plaintiff's cross motion for partial summary judgment is granted. An order in accordance with this opinion will issue.